MEMPHIS PLANNED
PARENTHOOD, INC.,
Plaintiff-Appellee,

v.

Donald SUNDQUIST, Governor of the State of Tennessee, and John Knox Walkup, Attorney General, Defendants-Appellants.

No. 97-6239.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 3, 1998.

Decided May 5, 1999.

Michael W. Catalano, Associate Solicitor General (argued and briefed), Office of the Attorney General, Nashville, Tennessee, for Defendants–Appellants.

Julie K. Sandine, Dodson, Parker & Behm, Nashville, Tennessee, Louise Melling (argued and briefed), Talcott Camp (briefed), American Civil Liberties Union Foundation, New York, New York, Dara Klassel (briefed), Planned Parenthood

Federation of America, New York, New York, for Plaintiff–Appellee.

Before: KEITH, NELSON, and NORRIS, Circuit Judges.

ALAN E. NORRIS, J., delivered the opinion of the court. DAVID A. NELSON, J. (pp. 467–68), delivered a separate concurring opinion. KEITH, J. (pp. 468–97), delivered a separate dissenting opinion.

ALAN E. NORRIS, Circuit Judge.

Memphis Planned Parenthood, Inc., ("MPP") petitioned the district court for a preliminary injunction preventing the State of Tennessee from enforcing its Parental Consent for Abortion by Minors Act ("Consent Act" or "Act"). The district court granted the injunction, and the state appeals.

## I. BACKGROUND

In 1995, the Tennessee General Assembly passed the Consent Act, making it illegal for a physician to perform an abortion on an unemancipated minor, unless the minor obtains the consent of one parent or receives a waiver of the consent requirement through a judicial bypass procedure. Tenn.Code Ann. ("TCA") §§ 37–10–301 through 37–10–307 (1998). MPP sought a preliminary injunction against enforcement of the Act. The district court granted the injunction, ruling that the judicial bypass procedure was not sufficiently expeditious and did not provide sufficient anonymity. The state appealed. Rule 24 of the Rules of the Supreme Court of Tennessee ("Rule 24") elaborates on the procedures to be followed in pursuing a judicial bypass. During the pendency of the state's appeal from the original grant of the preliminary injunction, the Supreme Court amended Rule 24. This court thereafter vacated the injunction as moot and remanded the case. *Memphis Planned Parenthood, Inc. v. Sundquist*, No. 96–6104, 1997 WL 436566 (6th Cir.1997) (unpublished opinion). The district court sub-

sequently determined that despite the amendments to Rule 24, a preliminary injunction should issue. That decision is the subject of the instant appeal. MPP challenged the following five provisions of the judicial bypass procedure found in either the Consent Act or Rule 24:

(1). *The twenty-four hour time to appeal:* A minor seeking to bypass the consent requirement must petition the juvenile court. TCA § 37–10–303(b). So long as the juvenile court rules within forty-eight hours of the filing of the minor's petition, a notice of appeal must be filed within twenty-four hours of the decision of the juvenile court. TCA § 37–10–304(g). If the juvenile court does not rule within forty-eight hours, the petition is deemed denied and the minor may file an appeal at any time. TCA § 37–10–304(d), (g).

(2). *The statement of mental capacity:* Rule 24(5)(a)(iv) requires the minor seeking to judicially bypass the consent requirement to state in her petition "whether the applicant is of sound mind and has sufficient intellectual capacity to consent to the abortion."

(3). *The venue restriction:* Although TCA § 37–10–303(b) allows the minor seeking a judicial bypass to petition "the juvenile court of any county of this state," Rule 24(4) requires the minor to file her petition in either the county in which she resides or the county in which the abortion is sought.

(4). *De novo hearing by circuit court:* If the juvenile court denies the petition, the minor may appeal to the circuit court. TCA § 37–10–304(g) provides that review of the juvenile court decision shall be *de novo*, and Rule 24(12)(d) allows the circuit court to call witnesses.

(5). *The pre-petition physician consultation:* The model petition appended to Rule 24 would have the minor swear that she "has consulted with the physician who is to perform the abortion, or

with a referring physician," concerning the abortion.

According to MPP, minors who feel they cannot involve their parents in their abortion decision face logistical problems in obtaining an abortion. MPP points to a number of reasons why a minor might choose not to involve her parent in her decision, such as: fear that her parents will not consent because of pro-life or strongly held religious views; fear of physical abuse if a parent learns of the pregnancy; worry over causing her parent stress; inability to involve a parent where the pregnancy resulted from incest; and inability to notify unavailable parents. The provisions in the bypass procedure set out above, MPP asserts, unnecessarily require the minor to make phone calls, to travel to court and to a physician, to secure absences from home and school, and to incur additional expense. MPP claims that a minor will face great difficulty in meeting these logistical demands while keeping her parents unaware of her pursuit of a judicial bypass.

## II. DISCUSSION

 "This court reviews a challenge to the grant or denial of a preliminary injunction under an abuse of discretion standard and accords great deference to the decision of the district court. The district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard."[1] *Blue Cross & Blue Shield Mutual of Ohio v. Columbia/HCA Healthcare Corp.*, 110 F.3d 318, 322 (6th Cir.1997) (citations omitted). "When ruling on a motion for a prelimi-

nary injunction, a district court must consider and balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Id.* (citations omitted).

The district court determined that MPP had demonstrated a strong likelihood of success on the merits and that the other preliminary injunction factors weighed in favor of granting the injunction. The district court also ruled that, under Tennessee law, the provisions it found likely unconstitutional should not be severed from the rest of the judicial bypass procedure. We hold that the district court abused its discretion in finding that MPP had demonstrated a strong likelihood of success on the merits. Alternatively, we hold that the district court abused its discretion in not severing the provisions it found offensive.

### A. *Likelihood of success on the merits*

The Supreme Court interpreted the Due Process Clause of the Fourteenth Amendment to include a woman's right to an abortion in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and affirmed the central holding of *Roe* in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). A plurality of the justices in *Casey* recognized the weighty concerns of the state in "the protection of potential life" and reasoned that, although "the woman has a right to choose to terminate or continue

---

**1.** The dissenting opinion repeatedly asserts that we erroneously engage in de novo review of the district court's opinion. However, as Judge Nelson's concurrence points out, we are bound to apply de novo review to questions of law. Although an "injunction will seldom be disturbed unless the district court relied upon clearly erroneous findings of fact," a reversal is in order whenever the district court "improperly applied the govern-

ing law." *Mascio v. Public Employees Retirement Sys.*, 160 F.3d 310, 312 (6th Cir.1998); *see also McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997). Thus, while we defer to the district court's determinations as to what burdens a minor may face in pursuing a judicial bypass, we review de novo the district court's rulings as to whether these burdens are "undue" and therefore unconstitutional.

her pregnancy before viability, it does not at all follow that the state is prohibited from taking steps to ensure that this choice is thoughtful and informed." *Id.* at 871–72, 112 S.Ct. 2791. The plurality determined that regulations the state places on abortion prior to viability should be analyzed under the "undue burden" standard.

A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

*Id.* at 877, 112 S.Ct. 2791. Although only a plurality of the justices employed the undue burden test, the courts of appeals, including this court, have used it in evaluating abortion regulations. *See Women's Med. Prof'l Corp. v. Voinovich,* 130 F.3d 187 (6th Cir.1997) (employing undue burden standard), *cert. denied,* —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998).

The undue burden test is directed at two principles. First, a state may impose restrictions on the woman's access to an abortion that are designed to help her make the most informed decision or that serve some other valid state interest; however, a state may not erect procedural hurdles in the path of a woman seeking an abortion simply to make it more difficult for her to obtain an abortion. Second, any procedural restriction must not be substantial.

■ The Constitution extends substantive due process protections to minors as well as adults. *Bellotti v. Baird,* 443 U.S. 622, 633, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). However, the constitutional rights of children are not co-extensive with those of adults because of "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Id.* at 634, 99 S.Ct. 3035. In reconciling these principles, the Supreme Court in *Bellotti II* held that while a state may require the consent of one or both parents before allowing a minor to obtain an abortion, it must provide a way for the minor to bypass the consent requirement and obtain the abortion. *Id.* at 643, 99 S.Ct. 3035. The Court established the following guidelines for determining whether a state's bypass procedure violated the minor's right to an abortion:

A pregnant minor is entitled in such a proceeding to show either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests. The proceeding in which this showing is made must assure that a resolution of the issue, and any appeals that may follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained.

*Id.* at 643–44, 99 S.Ct. 3035.

Moreover, *Bellotti II* indicated that a pregnant minor has the right to seek judicial bypass without parental involvement. The Massachusetts statute at issue in *Bellotti II* provided for limited judicial bypass, yet it also required that any available parent be notified of the minor's attempt to obtain judicial bypass. *Id.* at 646, 99 S.Ct. 3035. The Court ruled that because there were parents who would obstruct a minor's access to an abortion when she is sufficiently mature to make the decision on her own or when the abortion is in her best

interests, notifying the parents of the pending bypass proceedings "would impose an undue burden upon the exercise of minors of the right to seek an abortion." *Id.* at 647, 99 S.Ct. 3035.

### 1. *The twenty-four hour appeal provision*

■ Under the Act, if the juvenile court rules within forty-eight hours of the filing of the minor's bypass petition, a notice of appeal must be filed within twenty-four hours of the decision of the juvenile court. If the juvenile court does not rule within forty-eight hours, the petition is deemed denied, and the minor may appeal at any time. TCA § 37–10–304(d), (g). The twenty-four hours begins to run from the time of the juvenile court's decision, not from the time the minor receives notice of the ruling. TCA § 37–10–304(g). The district court concluded that MPP likely could prove that the notice of appeal provision imposes an undue burden on the minor seeking an abortion because it impermissibly shifts to the pregnant minor the burden of acting expeditiously. MPP argues that the twenty-four hour provision burdens a minor seeking judicial bypass because it creates logistical problems for her in the form of making telephone calls during a particular time and forcing her to return to the courthouse to file the notice of appeal within a short time-frame.

We believe that the twenty-four hour appeal provision does not place an undue burden upon a minor's ability to pursue a judicial bypass. First, Tenn.R.App.Proc. 4(d) allows civil litigants to file notices of appeal in advance.[2] Thus, a minor may file a notice of appeal at the conclusion of the hearing on her petition while already at the courthouse. *See Gaskill v. Gaskill,* 936 S.W.2d 626, 630 n. 4 (Tenn.Ct.App. 1996) (notice filed prematurely provides adequate notice to adverse party under Tenn.R.App.Proc. 4(d)). Additionally, if she has a lawyer, Tennessee's Notice of Appeal form does not exclude advance authorization of an appeal. Tenn.R.App. Proc., app. A., Form 1 (Michie 1999). She may authorize an appeal, leaving the date of the decision blank, and instruct her lawyer to file the notice when the decision is rendered. The ability to arrange for an appeal in advance of a decision by the court, either through her lawyer or by filing a notice of appeal prematurely, greatly alleviates the need to be in contact with and return to the court.

Second, should the minor not arrange for an appeal in advance of the juvenile court's decision, the window of time within which the minor must remain in contact with the court is only forty-eight hours. If within forty-eight hours of filing her petition she has not heard otherwise, she knows her petition has been denied and may appeal at any time. Although we recognize that making phone calls may raise some difficulties for a minor attempting to act in secret, such a burden cannot be characterized as substantial, particularly where the phone calls need only be made over a forty-eight hour period.

Third, the juvenile court is required to advise the minor that she has the right to court-appointed counsel, and the state is required to "provide a court-appointed advocate in each judicial district to give information regarding the legal process to the minor and to coordinate with the court-appointed counsel." TCA § 37–10–304(c)(1). These provisions assure a minor access to assistance in navigating the appeals process. Also, the clerk of the court has the responsibility of notifying the minor of the court's decision by delivering a copy of the order to the minor's attorney. Rule 24(10). Court-appointed counsel would have a professional obligation to

---

**2.** TCA § 37–1–159(g) states that appeals from decisions of the juvenile court such as the denial of a petition for a judicial bypass, shall be governed by the Tennessee Rules of Appellate Procedure. We assume that these rules continue to govern when not in conflict with rules particularly tailored for the judicial bypass proceeding found in the Consent Act and Rule 24.

stay in touch with the juvenile court during the brief forty-eight hour time period during which it could render a decision to insure that a notice of appeal is timely. Furthermore, since the lawyer would be attending the hearing with the minor, in order to expedite the process she could be asked then whether she wanted to appeal if she lost. Lastly, the appeal provision expedites the judicial bypass process and thereby serves the significant state interest in protecting the health of the minor because, as MPP itself notes, the longer the minor must wait to have an abortion, the greater her health risks become.

A similar twenty-four hour appeal provision was upheld in *Manning v. Hunt*, 119 F.3d 254 (4th Cir.1997). There the court ruled that a twenty-four hour appeal provision found in a North Carolina bypass procedure was not an undue burden, in part because that statute, like the Tennessee Consent Act, required the state to provide court-appointed counsel at the minor's request. *Id.* at 275. Although the statute in *Manning*, unlike the Tennessee Consent Act, required the North Carolina district courts to make a decision at the conclusion of the initial hearing, thereby foreclosing any logistical problems in learning of the court's decision, this difference does not tip the scales in favor of unconstitutionality in view of the safeguards provided by the Tennessee procedure. In addition, Rule 24(11)(d) states that the "court should endeavor to rule at the conclusion of the hearing," thus making any difference between the Tennessee and the North Carolina bypass procedures even less significant. *See also Planned*

*Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 491–92 n. 16, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983) (quoting portions of a Missouri statute containing a twenty-four-hour notice of appeal and stating that "this section provides the framework for a constitutionally sufficient means of expediting judicial proceedings") (Rehnquist, C.J., concurring with Powell, J.).[3]

### 2. The statement of mental capacity

■ Rule 24(5)(a)(iv) requires the minor seeking to judicially bypass the consent requirement to state in her petition "whether the applicant is of sound mind and has sufficient intellectual capacity to consent to the abortion." The district court held that this provision was likely unconstitutional because it deterred minors who were not of sound mind and sufficient intellectual capacity from pursuing the judicial bypass procedure and therefore subverted the *Bellotti II* requirement that a judicial bypass be available for those minors in whose best interests it is to have an abortion.

■ Such a holding is unwarranted. Rule 24 requires only that the minor state "whether [she] is of sound mind and has sufficient intellectual capacity"; it does not foreclose her from seeking an abortion if she does not have that capacity. The Rule thus asks for one form of proof for determining whether the minor satisfies the maturity prong of *Bellotti II*. Although item six of the model application contained in the appendix to the Rule requires the

---

3. The dissenting opinion repeatedly notes the district court's findings concerning the added difficulties imposed by the Consent Act on minors seeking a judicial bypass and reasons that because some minors will be precluded from effectively pursuing a judicial bypass, the burdens imposed by the Act are undue. However, *every* added procedure will necessarily cause some hardship, yet not every procedural obstacle to an abortion creates an undue burden. *See Casey*, 505 U.S. at 881–86, 112 S.Ct. 2791 (upholding various provisions of a Pennsylvania abortion statute, de-

spite recognizing that the added procedures will cause hardships to women seeking an abortion). In addition, *any* procedure will, in conjunction with *some* conceivable set of circumstances, prevent some minor from effectively pursuing a judicial bypass. Our responsibility is to determine which procedures are so onerous as to be "undue," and the fact that some minors will be practically precluded by a procedure in conjunction with circumstance from pursuing a judicial bypass does not mean that the procedure is unconstitutional.

minor to state affirmatively that she is of "sound mind and has sufficient intellectual capacity," according to Rule 24(6) a minor's application need only be in substantial conformity with the model application. *See also Ashcroft,* 462 U.S. at 479 n. 4, 493, 103 S.Ct. 2517 (1983) (quoting portions of the Missouri parental consent statute requiring the minor or her next friend to state that the minor is of sound mind and sufficient intellectual capacity and stating that the statute "avoids any constitutional infirmities") (Rehnquist, C.J., concurring with Powell, J.).[4]

### 3. *The venue restriction*

■ Although TCA § 37–10–303(b) permits the minor seeking judicial bypass to petition "the juvenile court of any county of this state," Rule 24(4) requires the minor to file her petition in either the county in which she resides or the county in which the abortion is sought. The district court found that the Rule "affirmatively creates a substantial risk that a young woman's confidentiality will be compromised, either by direct discovery in her home county or because of her prolonged absence traveling to the county where the abortion will be performed." In coming to this conclusion the district court incorrectly assumed that the Rule trumps the Act.

■ When a rule of court conflicts with a legislative act, the general rule is that the act controls. *See, e.g., Amsler v. United States,* 381 F.2d 37, 42–43 (9th Cir. 1967); *Nichols v. King,* 190 Tenn. 573, 584, 230 S.W.2d 1006, 1011 (1950). Tennessee has a mechanism by which procedural rules promulgated by the Tennessee Supreme Court may be approved by resolution of both houses of the Tennessee General Assembly. TCA §§ 16–3–401, 16–3–404. After such approval, the rules control despite conflicting provisions of the Tennessee Code. *See Mid–South Pavers, Inc. v. Arnco Const., Inc.,* 771 S.W.2d 420, 422 (Tenn.Ct.App.1989) (Tennessee Rules of Civil Procedure, promulgated by the Tennessee Supreme Court and approved by joint resolution of the Tennessee General Assembly, trump conflicting provisions of the Tennessee Code). However, neither party has presented evidence to this court that Rule 24 of the Rules of the Supreme Court of Tennessee has been approved by joint resolution, nor has our independent research discovered any such evidence.

We are confident that under Tennessee law the venue provision found in the Consent Act prevails over that found in Rule 24(4). The venue provision in the Consent Act does not burden a minor seeking a judicial bypass. Indeed, it does not appear that a greater choice of venue could be provided.

### 4. *De novo hearing requirement*

■ TCA § 37–10–304(g) provides that review of an adverse decision by the juvenile court of a minor's bypass petition shall be de novo by the state's circuit court, and Rule 24(12)(d) allows that court to call witnesses. The district court held that the de novo hearing provision was likely unconstitutional because of the added burden of a second trip to the courthouse. The state argues that de novo review actually benefits a minor as it increases her chances of overturning an adverse ruling by the juvenile court. The Fourth Circuit considered an identical provision in *Manning v. Hunt, supra,* and held that it was likely constitutional.

While it may be that a second hearing could add stress and logistical difficulty, a minor whose initial petition is denied

---

**4.** The dissent argues that Rule 24(5)(a)(iv) poses an undue burden because minors may misunderstand its requirements. While it may be, as the district court found, that some minors will misunderstand the requirements of the Rule and decline to file an application, the Rule is sufficiently clear so that it does not constitute an undue burden. A great many persons forfeit their rights from a failure to understand court or government rules frequently far more complicated than that involved here, but this does not mean that such rules are unconstitutional.

would surely prefer the expanded opportunities afforded her by de novo review. The issues raised by the bypass petition—whether the minor is of sound mind and sufficient intellectual capacity to make a decision about abortion or the abortion is in her best interests—are particularly fact sensitive, and an appellate court reviewing only the factual record made in the trial court would be expected to accord great deference to the trial court's view of the consequences of that record. *See Collins v. Howmet Corp.*, 970 S.W.2d 941, 943 (Tenn.1998) ("When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings."); *In the matter of Michael Lee Parsons*, 914 S.W.2d 889, 895 (Tenn. Ct.App.1995) (where "trial judge as the trier of fact had the opportunity to observe [the] parties and their manner and demeanor on the witness stand, ... the weight, faith and credit accorded to their testimony by the trial judge is entitled to great weight in this Court").

The district court reasoned that de novo review would not amount to an undue burden if it were triggered at the minor's option, rather than permitting the circuit court to control the proceedings. We are at a loss to understand how it can be seriously contended that by affording a reviewing court additional tools to carry out its responsibility of protecting the interests of a petitioning minor, the Tennessee General Assembly has placed a substantial obstacle in her path that hinders her choice in any meaningful way. One could just as unconvincingly argue that the initial hearing in juvenile court is more burdensome than allowing the minor to make her case entirely in writing. Whatever burden is placed upon the minors by a hearing requirement at both the juvenile and circuit court levels best serves the purpose of assuring that those minors who qualify for judicial bypass receive it and that those who do not qualify must obtain parental consent.

## 5. *The pre-petition physician consultation*

■ The model petition appended to Rule 24 would have the minor swear that she "has consulted with the physician who is to perform the abortion, or with a referring physician" concerning the abortion. The district court held that this requirement likely places an unconstitutional burden on the minor. According to the district court, arranging for and going to the consultation, all the while keeping it secret, would create many difficulties for minors seeking abortions. Recognizing that the minor must consult with a physician sometime before the abortion is performed, MPP argues on appeal that the requirement is unduly burdensome in that it forces the minor to consult with a physician prior to filing her petition, whereas absent the requirement she could consult with a physician at any time, including the day the procedure is to be performed.

However, as the state notes, nothing in the Consent Act demands that the consultation be face-to-face, and telephone consultation would decrease the logistical problems. In addition, this requirement of a pre-petition consultation with a physician seems designed to assist the juvenile court in its determination of whether the minor is capable of making the decision or whether the abortion is in her best interests. Accordingly, requiring an early, as opposed to later, consultation does not amount to an undue burden, especially as it is aimed at "inform[ing] the woman's free choice, not hinder[ing] it." *Casey*, 505 U.S. at 877, 112 S.Ct. 2791. The Court in *Casey* held that a state can require that a doctor give a woman certain information before she may have an abortion. 505 U.S. at 884, 112 S.Ct. 2791. Due to "the peculiar vulnerability of children; their inability to make crucial decisions in an informed, mature manner; and the importance of the parental role in child rearing," *Bellotti*, 443 U.S. at 634, 99 S.Ct. 3035, the

requirement is particularly justified where the person seeking an abortion is a minor. Therefore, MPP did not demonstrate a likelihood of success on the merits, as regards the pre-petition physician consultation requirement.

Because our determination that MPP did not demonstrate a likelihood of success on the merits regarding any of the challenged provisions is sufficient to reverse the district court's grant of the injunction, we decline to address the district court's ruling on the other three injunction factors.

### B. *Severability*

 The district court ruled that the provisions of the Consent Act and Rule 24 it found objectionable should not be severed. State law governs the question of severability. *Leavitt v. Jane L.*, 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996). Tennessee law permits severance only when "it is made to appear from the face of the statute that the legislature would have enacted it with the objectionable features omitted." *State v. Harmon*, 882 S.W.2d 352, 355 (Tenn.1994) (citations omitted). Both parties agree that the approach to severability should be the same when the provision at issue is found in Rule 24 rather than the Consent Act itself. We hold that the district court abused its discretion in enjoining the state from implementing the Consent Act and Rule 24 rather than severing the provisions it found offensive and leaving the remainder of these Tennessee laws intact.

 In determining whether a provision should be severed, the proper inquiry is whether the Tennessee General Assembly or the Tennessee Supreme Court would choose, on the one hand, having no Consent Act or Rule 24 at all and, on the other, passing the Consent Act or promulgating Rule 24 without the offensive provisions. The question is not whether the judicial bypass procedure without the severed provisions is the procedure either the Tennessee General Assembly or the Tennessee Supreme Court would have established had either known certain provisions were unconstitutional.

If the challenged provisions are severed from the judicial bypass procedure, the remaining portions of the Consent Act are "capable of enforcement and fairly answer[ ] the object of its passage." *State v. Tester,* 879 S.W.2d 823, 830 (Tenn.1994). First, the twenty-four hour appeal, if severed, would be replaced by TCA § 37–1–159(g), which provides that "appeals in all other civil matters heard by the juvenile court shall be governed by the Tennessee Rules of Appellate Procedure." Tenn. R.App. Proc. 4 allows for an appeal within thirty days after entry of the final judgment. Second, the statement of mental capacity requirement could be severed without impairing the juvenile court's ability to process applications for judicial bypass. Whether the minor is of sound mind and sufficient mental capacity is information that can be gathered at the juvenile court proceeding. Third, should the venue restriction in Rule 24(4) be enjoined, TCA § 37–10–303(b)—the venue provision found in the Consent Act itself—would step back in to allow the minor to file her petition in "the juvenile court of any county of this state." Fourth, without the de novo hearing provision, the Tennessee circuit courts could still review the decision of the juvenile court on the record in the usual manner. Fifth, if the state is enjoined from enforcing the pre-petition physician consultation requirement, the juvenile court may still make a determination as to the minor's need for an abortion or her mental capacity to make the abortion decision on her own by calling witnesses.

Certainly the Tennessee General Assembly and the Tennessee Supreme Court would prefer the judicial bypass system as presently established in the Consent Act and Rule 24. However, TCA § 37–10–301(a) sets out the legislative intent, and all three state interests listed—protecting minors, fostering the family structure, and protecting the rights of parents—would be

better served by a Consent Act with a judicial bypass procedure less the challenged provisions than no Consent Act at all. Therefore, the district court abused its discretion in failing to sever the portions of the Consent Act and Rule 24 that it found objectionable.

### III.

For all the reasons set out above, the order of the district court is **reversed**, and the cause is **remanded** to the district court for further proceedings consistent with this opinion.

DAVID A. NELSON, Circuit Judge, concurring.

Judge Norris' temperate and dispassionate analysis of the question whether Tennessee's Parental Consent for Abortion by Minors Act is likely to fail the "undue burden test" seems sound to me; I fully concur in his opinion. My purpose in writing separately is simply to offer a brief response to our dissenting colleague's charge that my concurrence flies in the face of what I wrote earlier in *Mascio v. Public Employees Retirement Sys. of Ohio*, 160 F.3d 310 (6th Cir.1998), with respect to the "abuse of discretion" standard that governs our review of preliminary injunctions.

At issue in *Mascio* was an Ohio statute that mandated a forfeiture of vested retirement benefits—benefits that the plaintiff had a clear contractual right to receive. The Constitution of the United States expressly prohibits any state from passing such legislation: "No state," the Constitution declares, "shall ... pass any ... Law impairing the Obligation of Contracts...." U.S. Const. art. I, § 10, cl. 1. In my view, therefore, the normal presumption of constitutionality did not apply to the Ohio statute being challenged in *Mascio*.

The district court granted a preliminary injunction in that case largely on the strength of the plaintiff's "strong likelihood of success on the merits...." *Id.* at

313. Given the clear language of the Constitution, "strong likelihood of success" appeared to me to be something of an understatement—and the ultimate outcome of the case being a forgone conclusion, as I saw it, it seemed obvious to me that the district court had not abused its discretion in preliminarily enjoining enforcement of the Ohio statute.

It was against this background that the opinion I wrote for the court in *Mascio* cited earlier case law suggesting that a preliminary injunction "will seldom be disturbed unless the district court ... [among other alternatives] improperly applied the governing law...." *Id.* at 312. And it was against this background that I quoted the observation of another panel that "[t]his court 'will reverse a district court's weighing and balancing of the equities only in the rarest of circumstances.'" *Id.* at 313, quoting *Moltan Co. v. Eagle–Picher Indus., Inc.*, 55 F.3d 1171, 1175 (6th Cir. 1995).

Nothing in *Mascio* requires us to affirm the preliminary injunction in the case at bar. Here—as was not true in *Mascio*—we are dealing with a state statute that is entitled to the usual presumption of constitutionality. Here—as was not true in *Mascio*—there is nothing in the language of the Constitution that purports to prohibit states from passing legislation of the sort being challenged. Here—as was not true in *Mascio*—it is my best judgment (a judgment, I submit, in which I am not required to defer to the district court) that there is no strong likelihood of the plaintiff ultimately succeeding on the merits. And here—as was not true in *Mascio*—I believe that the district court improperly applied the governing law, that law being, in this case, the "undue burden test."

Judges can and do differ, not surprisingly, as to when a burden becomes constitutionally "undue." But the question, I believe, is ultimately one of constitutional law—and the notion that, under *Mascio*, the district court's "weighing and balancing of the equities" somehow diminishes

my responsibility, as a member of this court, for making a judgment as to how the constitutional question will be resolved is a notion that strikes me as profoundly misguided.

KEITH, Circuit Judge, dissenting.

Because I cannot remember a time in my thirty-two years as a jurist when I more strongly disagreed with a majority opinion, I vehemently dissent. The majority's outcome-driven decision today ignores the standard of review we are bound to employ in adjudicating such an appeal; perverts the law; and does violence to the constitutional rights and liberties guaranteed to *every* female in this country.

In *Roe v. Wade,* 410 U.S. 113, 152–66, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court held that under the Due Process Clause of the Fourteenth Amendment, a pregnant woman has a constitutional right to chose to terminate her pregnancy before viability. Furthermore, the Court has held that a state may not require a minor female to obtain parental consent before exercising her right to choose to have an abortion unless an alternative bypass procedure is in place if she, for whatever reason, wishes to proceed without parental knowledge of her decision. *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*"Bellotti II"*). Moreover, the bypass procedure must "be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained," *Bellotti II,* 443 U.S. at 644, 99 S.Ct. 3035, such that the statutory requirements associated with the bypass procedure cannot impose an "undue burden" on the minor's right to choose. *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 874, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion). Regardless of where an individual stands on the controversial topic of a woman's right to undergo an abortion, including the right of a minor female to do so without parental consent, this is, in fact, the state of law which this court is obligated to follow.

However, in reversing the district court's imposition of a preliminary injunction against the enforcement of Tennessee's Parental Consent for Abortions by Minors Act of 1995, Tenn.Code Ann. §§ 37–10–301 to –307 and Tennessee Supreme Court Rule 24 (collectively "the Act")[1], the majority engages in an inappropriate analysis under an erroneous standard of review, thereby disavowing its obligation to follow the law and Supreme Court precedent. The majority's decision turns *Roe, Bellotti II, Casey,* and their progeny on their heads inasmuch as the statutory requirements imposed by the Tennessee legislature make it a practical impossibility for a minor to obtain an abortion without first consulting or notifying a parent to seek the parent's permission. That is to say, the majority's overreaching holding effectively nullifies a minor female's right to choose to terminate her pregnancy without parental consent as guaranteed to her by the Constitution and Supreme Court precedent, because to say that the minor female has the right to have an abortion without parental consent as long as she overcomes extreme logistical hurdles is to say that she has no right at all.

The voices of our children, and in this case minor females in particular, are the voices which need to be listened to and heeded the most, and yet historically are the least likely to be heard. The majority's decision today turns a deaf ear to the voices of pregnant minor females who may find themselves victims of incest or rape with no means of financial or emotional support, to the point that the court's holding leaves these young girls with no voice and, as a result—*no choice.* It is a repug-

---

1. Inasmuch as Tennessee's Parental Consent for Abortions by Minors Act of 1995 takes effect only as implemented by Tennessee Supreme Court Rule 24, I will refer to both the statute and the statute as implemented by Rule 24 as "the Act."

nant outcome from which I cannot distance myself far enough, and from which I therefore adamantly dissent.

## I.

### Standard of Review—Preliminary Injunction

At the outset, I wish to emphasize the proper standard of review under which this court proceeds in reviewing a challenge to the grant of a preliminary injunction. Although the majority recites the proper standard in its decision, its recitation is nothing more than a mere expression of words where the majority goes on to employ a *de novo* standard of review in reaching its legally erroneous, result-driven holding.

Our review of a district court's decision to grant a preliminary injunction is extremely limited where we are required to accord *great deference* to the district court's decision in determining whether the court abused its discretion in granting the preliminary injunction. *Mascio v. Public Employees Retirement Sys.*, 160 F.3d 310, 312–13 (6th Cir.1998). As Judge Nelson recognized in *Mascio:*

> The injunction *will seldom be disturbed* unless the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard. *See Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n,* 110 F.3d 318, 322 (6th Cir.1977).

> In exercising its discretion with respect to a motion for a preliminary injunction, a district court must give consideration to four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Rock & Roll Hall of Fame & Museum, Inc. v.* *Gentile Prods.,* 134 F.3d 749, 753 (6th Cir.1998).

> In this circuit, "the four considerations applicable to preliminary injunction decisions are factors to be balanced, *not prerequisites that must be met.*" *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985). The court "will reverse a district court's weighing and balancing of the equities *only in the rarest of circumstances.*" *Moltan Co. v. Eagle–Picher Indus., Inc.,* 55 F.3d 1171, 1175 (6th Cir.1995).

160 F.3d at 312–13 (emphasis added).

In the present case, Judge Nelson's decision to join Judge Norris in reversing the district court's order granting Memphis Planned Parenthood, Inc. ("MPP") a preliminary injunction, flies in the face of his accurate acknowledgment and application of the standard of review set forth in *Mascio.* The facts of this case hardly rise to the level of the "rarest of circumstances" for reversal of the district court's preliminary injunction, particularly where the majority conspicuously fails to note any instance where the district court "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Mascio,* 160 F.3d at 312. On the contrary, it is the *majority* that relies upon clearly erroneous and speculative findings of fact, improperly applies the law—or applies no law at all, and engages in an erroneous *de novo* standard of review in perverting the law and using it as a subterfuge to achieve an end.

As this dissent will demonstrate in the sections that follow, when one applies the appropriate standard of review to the district court's order granting MPP a preliminary injunction, it is clear that the court did not abuse its discretion in concluding that there is a substantial likelihood that the five aspects of the Act at issue are unconstitutional, that the movant will suffer irreparable injury without the injunction, that the probability that the issuance of the injunction will cause substantial

harm to others is low, and that the public interest will be best served by the issuance of the injunction.

## II.

### Factors to Consider & Balance in Ruling on a Motion for a Preliminary Injunction

**A. Substantial Likelihood of Finding that the Five Provisions are Unconstitutional**

#### 1. Twenty–Four Hour Notice of Appeal Filing Requirement

The majority conspicuously fails to note those specific findings of fact upon which the district court concluded that the twenty-four hour notice of appeal filing requirement imposed an undue burden on female minors such that the provision would likely be found unconstitutional. The majority's calculated decision to ignore the district court's specific factual findings in all likelihood results from the majority's desire to improperly substitute *its* judgment for that of the district court, and the majority could not do so without engaging in an improper standard of review or risk exposing its self-serving purpose. As such, I specifically note the district court's findings which are an accurate and realistic determination of the logistical hurdles faced by these female minors in securing an abortion without parental knowledge, as well as the court's proper conclusions of law.

### District Court's Findings of Fact & Conclusions of Law

The district court concluded that the twenty-four hour notice of appeal provision impermissibly shifted to the pregnant minor the burden of acting expeditiously and imposed an undue burden upon her right to obtain an abortion. In reaching this conclusion, the district court relied upon the declarations from clinic directors and administrators, and noted the "extreme limitations faced by teen-aged pregnant patients in making arrangements to obtain

their abortions without parental knowledge." (J.A. at 411.) For example, the court found that many of these girls have little or no access to making telephone calls, as illustrated by a clinic director in Memphis who stated in her declaration to the court that often the girls will have to hang up in the middle of a call because a parent has arrived home unexpectedly, and often cannot call back for a day or two. In addition, the district court noted that the problem is compounded if the calls are long distance and the telephone number then appears on the monthly phone bill. The minor's parents are then able to call the number to inquire as to the nature of the establishment and who made the call; and, although the clinics assert that they never reveal the name of the party who made the initial call, just knowing that someone from the home called the clinic is enough to destroy the minor's confidentiality. Furthermore, the court found that about ten percent of the clinic's patient's do not even have a phone in their home and, although some minors use pay phones to call the clinic, they cannot always get to a pay phone to make a call in a timely fashion.

In addition, the court found that the difficulty of making even a single call is exponentially increased when a minor attempts to be absent from home, school, or work. Every time a minor finds it necessary to be absent from the place where she is expected to be, she arouses suspicion, is forced to be untruthful about her whereabouts, and runs the risk of being caught. Finally, the court found that these difficulties especially hold true for those females who must travel long distances to reach the clinic, do not drive or have access to an automobile, and must rely upon others for transportation to and from the clinic.

The court opined that given the realities faced by these minor girls—not having phone access to make calls; accountability for being absent from home, school, or work; and the lack of transportation to

travel to the clinic, particularly when the clinic is not located in close proximity to their home—the twenty-four hour appeals limit would be an impossible requirement for many minors to satisfy, and therefore there was a substantial likelihood of the provision being found unconstitutional. The court reasoned as follows:

> Under the Tennessee law, a minor must first find the opportunity to call the courthouse to learn the juvenile court's decision, which is undoubtedly already hours old. She must immediately understand what the denial means for her, what the procedure is for appealing it, and what the repercussions are if she fails to do so. She must immediately secure transportation to the courthouse to prepare and file an appeal, and make the trip and back without arousing her parents's suspicion. Such a tight timeline is especially unrealistic in light of this Court's conclusion *infra* that many minors will attempt to file such petitions outside their home counties and thus will travel greater distances to file their petitions.

(J.A. at 412.)

The district court was not persuaded otherwise by the state's provision of an "800" number and court-appointed advocates and attorneys, noting that "these mechanisms lessen some burdens only at the expense of creating others: while an advocate or attorney may do some of the procedural legwork for a minor, the fact that a minor is represented changes only whom the minor is required to call in pursuing her petition, not the fact of having to make phone calls under tight time constraints. Moreover, the same difficulties encountered by minors in *making* phone calls also apply to their *receiving* them." (J.A. at 413 (emphasis in original).) The court further found that the fact that the state offers an "800" number, an advocate, and an attorney to minors, does not lessen the deprivation suffered by those minors who choose to proceed unrep-

resented, and who lose their right to appeal as a result.

Finally, the district court found that the state failed to articulate a substantial countervailing interest in imposing the twenty-four hour notice of appeal requirement, particularly when elsewhere in the Act no such limits are imposed. By way of example the court pointed out that "if the juvenile court fails to rule on the petition within forty-eight hours, a minor may appeal 'immediately,' but is not held to any time limit. Tenn. Sup.Ct. R. 24(11)(d). Similarly, if the circuit court denies the appeal, the minor faces no restriction on the time it takes for her to appeal to the Supreme Court. Tenn. Sup.Ct. R. 24(12)(e)." (J.A. at 414.)

### *Majority Opinion*

The majority minimizes the magnitude of the substantial obstacles which the district court found were associated with the requirements of the twenty-four appeal, by failing to consider any of the court's findings of fact and by reducing the district court's ruling to one sentence—and adding an additional sentence couched in terms of MPP's argument—as follows:

> The district court concluded that MPP likely could prove that the notice of appeal provision imposes an undue burden on the minor seeking an abortion because it impermissibly shifts to the pregnant minor the burden of acting expeditiously. MPP argues that the twenty-four hour provision burdens a minor seeking judicial bypass because it creates logistical problems for her in the form of making telephone calls during a particular time and forcing her to return to the courthouse to file the notice of appeal within a short time-frame.

After making this conclusory notation, the majority then goes on to state that "[w]e believe that the twenty-four hour appeal provision does not place an undue burden upon a minor's ability to pursue a judicial bypass" for four reasons: 1) Tennessee Rule of Appellate Procedure 4(d) allows

civil litigants to file notices of appeal in advance thereby alleviating the need to be in contact with and return to the court; 2) even if the minor does not arrange for an appeal in advance of the juvenile court's decision, the window of time with which a minor must remain in contact with the court is only forty-eight hours, and requiring a minor to make calls—even when difficult to do so—over a forty-eight hour period cannot be characterized as substantial; 3) the juvenile court is required to advise the minor that she has the right to court-appointed counsel, and the state is required to provide a court-appointed advocate in each judicial district to give information regarding the legal process which thereby assure a minor access to assistance in navigating the appeals process; and 4) the appeal provision expedites the judicial bypass process and thereby serves the legitimate state interest of protecting the health of minors because, the longer that the minor has to wait for the abortion, the greater her health risks become.

I emphatically disagree with the majority's holding which impermissibly engages in a *de novo* review of the issue and begs the question as to whether the district court abused its discretion in granting the preliminary injunction by "rel[ying] upon clearly erroneous findings of fact" or improperly applied the law.[2] *See Mascio,* 160 F.3d at 312. The law is well-settled that a factual finding may be considered clearly erroneous when, although there is evidence to support the finding, "the reviewing court is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). However, if a district court's account of the evidence is plausible in light of the record viewed in

its entirety, the reviewing court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Therefore, a district court's choice between two permissible views of the evidence cannot be clearly erroneous. *Id.* at 574, 105 S.Ct. 1504.

I firmly believe that the district court did not rely upon clearly erroneous factual findings in deciding to issue the injunction. The court's findings that the twenty-four hour notice of appeal requirement was an undue burden in light of the logistical demands of having to contact the juvenile court when access to a telephone is sometimes a literal impossibility; having to possibly return to court a second time when the minor must be accountable for her time spent away from home, work, or school; as well as having to possibly return to court when she has no means of transportation and must rely upon a ride from someone else, were based upon the declarations from experts in the field, clinic administrators and directors, and thus entirely "plausible in light of the record viewed in its entirety." *Anderson,* 470 U.S. at 573–74, 105 S.Ct. 1504.

For example, a review of the record indicates that Stanley K. Henshaw, Ph.D., submitted a declaration in support of a preliminary injunction against the enforcement of the Act, wherein he stated that, as Deputy Director of Research for the Alan Guttmacher Institute in New York City, he was "responsible for overseeing a period survey of all abortion providers in the United States, including almost 2400 hospitals, free standing clinics, and doctors who provide abortion in their offices." (J.A. at 15–16, Henshaw Decl. at ¶¶ 2, 3.) Dr. Hen-

2. It is undisputed that the "undue burden" test is the proper law to be applied in determining whether the Act's provisions at issue will be found unconstitutional. *See Casey,* 505 U.S. at 877, 112 S.Ct. 2791 (plurality opinion); *Women's Med. Prof'l Corp. v. Voinovich,* 130 F.3d 187, 196 (6th Cir.1997), *cert.*

*denied,* —— U.S. ——, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998) (citing *Casey* and adopting the undue burden test); *Manning v. Hunt,* 119 F.3d 254, 260–61 & n. 2 (4th Cir.1997) (collecting cases applying the undue burden test).

shaw further stated that in this capacity, he "analyze[d] and interpret[ed] data relating to pregnancy and abortion for minors, parental involvement for minors seeking abortions, and obstacles to abortion for minors and adult women." (J.A. at 15, Henshaw Decl. at ¶ 2.) After reviewing the Act, Dr. Henshaw concluded that "the consequences of the delay and lack of anonymity occasioned by the Tennessee Consent Act will result in irreparable harm to significant numbers of minors, by increasing the risks to their health, compromising their privacy, and forcing some to carry to term." (J.A. at 21, Henshaw Decl. at ¶ 15.) Dr. Henshaw based his conclusion on his abundant research and studies which indicated that if the Act fails to ensure anonymity or confidentiality at every stage of the waiver process, the minor female will suffer adverse consequences when her parents somehow find out about the abortion. (J.A. at 17, Henshaw Decl. at ¶ 7.) For example, Dr. Henshaw noted that fifty-eight percent of minors reported adverse consequences such as being physically abused, being forced to leave home, being forced to carry to term, or being the cause of marital problems between parents when their parents discovered that the minor was pregnant and seeking an abortion. (J.A. at 17–18, Henshaw Decl. at ¶¶ 5–7.) Moreover, Dr. Henshaw opined that a minor's fear of being discovered by a parent will cause the minor to delay in seeking the abortion, and the delay will ultimately harm the minor in that the health risks associated with the abortion process increase the longer the minor waits. He noted that although abortion is one of the safest surgical procedures with very little risk of fatal complications, delay in the performance of an abortion increases its risk in that both the morbidity and mortality rates for abortion increase with advancing gestational age, and the tendency of minors to obtain abortions later in pregnancy has the largest single effect on the morbidity and mortality rates for abortion in this population.

Dr. Henshaw opined that the delay engendered by the Act is particularly serious in that it will exacerbate the delay already experienced by minors. He specifically noted that the Act's appeals process may take up to three to four weeks to complete and that a delay of this magnitude could significantly increase the health risks for these girls. Furthermore, Dr. Henshaw opined that the delay associated with the appeals process brought about additional problems such as increased cost of the abortion procedure and decreased availability of the procedure, and may actually force some minors to self-abort. Dr. Henshaw noted that,

> "[s]ome teens desperate to end their pregnancies and unwilling to tell a parent, and deterred from pursuing a bypass, may attempt to self-abort, with adverse consequences to their health." One study of minors reports that nine percent said that they would have a self-induced or illegal abortion if forced to notify their parents. *The American Medical Association (AMA) reports that the desire to maintain secrecy about abortion has been one of the leading reasons for illegal abortion deaths since 1973.* Council on Ethical and Judicial Affairs, American Medical Association, *Mandatory Parental Consent to Abortion*, 269 JAMA 82, 83 (1993). *Because of such factors, the AMA has taken the position that, while minors should be encouraged to discuss their pregnancy with their parents and other adults, they should not be compelled to involve their parents before obtaining an abortion. Id.* at 84, 86. To the extent the Consent Act fails to provide an adequate alternative, it amounts so such compulsion.

(J.A. at 20, Henshaw Decl. at ¶ 13 (emphasis added, citation omitted).)

The record is replete with declarations from clinic administrators and directors buttressing Dr. Henshaw's assessment that the risk to a minor's confidentiality and anonymity associated with the Act and

474

the twenty-four hour appeal requirement in particular, as well as the added delay associated with the same, imposed substantial obstacles to a minor's right to choose and therefore constituted an undue burden. For example, Judy G. Stogner, Director of Clinical Services at MPP, declared that it has been her experience that the minors seeking an abortion without parental consent do so for a number of reasons including that some live in households where parental support is nonexistent and where abuse, neglect, and psychological maltreatment are commonplace. Others fear that the news of the pregnancy will increase family stress because the family cannot afford the expense in that news of the pregnancy will exacerbate a parent's drug or alcohol problem, or may impair the health of an already ill parent. Because of the real and perceived potential harm, the minor's concern for confidentiality and anonymity are paramount. By way of example, Stogner noted as follows:

> Just yesterday, a pregnant minor came to MPP for counseling who could not obtain consent from either parent because of their strongly held "pro-life" views. This minor is fearful of using the judicial bypass because of concerns about confidentiality and negotiating the court process. She is considering travelling 300 miles to Granite City, Illinois for her abortion. That state does not have a parental involvement law in effect.

(J.A. at 35, Stogner Decl. at ¶ 7.) Stogner expressed that confidentiality is a particular problem in rural communities where the minor's actions can easily be detected by relatives and friends, and that minors who are already anxious about and skeptical of assurances of confidentiality will be deterred from using the bypass procedure. She found this to be especially so in relation to the twenty-four hour appeal requirement because not only does it compromise confidentiality, it also adds to the delay in the abortion process—or even the decision to carry to term or self-abort—because each additional step in the bypass

procedure requires the minor to figure out, once again, how to take needed action undetected by her parents, relations, and acquaintances. Stogner concluded that

> [t]he task of making or receiving call undetected, of explaining unknown callers to a parent who might answer the phone, and of leaving home to confer with counsel or file papers in court, without attracting attention, will be more than some minors can accomplish. This is particularly true given that the twenty-four deadline prevents the minor from being able to wait even a day, until such time as her parents might return to work, a family gathering ends, or an opportunity to slip away to make calls otherwise arises. The short time frame simply denies the woman the flexibility she will often need to protect her privacy. If she cannot act within the day, she will lose her right to attempt to bypass the consent requirement.

(J.A. at 39, Stogner Decl. at ¶ 15.)

Diane Butler, Director of the Memphis Center for Reproductive Health, submitted an affidavit declaring the same concerns about the Act and the twenty-four hour appeals process as Dr. Henshaw and Stogner. Butler specifically found that the twenty-four hour appeals process was unduly burdensome in that the time constraint will prevent many minors from lodging the appeal or it will force them to act so rashly that their parents will discover their plans. She noted that based on her experiences of the minor's difficulty in making telephone calls, it was not possible for the minor to make the necessary calls to the court to learn of the judge's decision until it was too late:

> If the judge does not rule on the petition at the hearing while the minor is present, he or she has forty-eight hours to decide. That means that, to be safe, the minor should contact the court or her attorney, if she has one, regularly during that two-day period. Those minors without parental consent simply can't do

that without arousing suspicion from their parents and jeopardizing the confidentiality the minors are trying to preserve.

(J.A. at 158, Butler Decl. at ¶ 9.) Butler further opined that the communication problem lay not only in making the calls, but in receiving them as well:

> It will not make matters easier if the court clerk, attorney, or DHS worker tries to inform the minor of the decision by calling her. To the extent minors have trouble making calls, the problems they face receiving calls in confidence are even greater. Caller ID is now widespread, and parents have been using it as a tool to keep tabs on their children. I have had minors tell me that a parent will record every call that is made to the home, and question them about any call the parent does not recognize. Calls from strangers—even if not detected on caller ID—raise suspicion. Leaving messages is also not an option, unless done through a trusted friend. It takes time, however, for the minor to learn of the message and return the call safely. Obtaining information about the abortion discreetly is one of the greatest challenges minors face. It requires time and planning—neither of which is allowed for under the twenty-four hour appeal restriction.

(J.A. at 158, Butler Decl. at ¶ 10.) Butler added that minors also face great obstacles in getting away from home or school to have the abortion without parental knowledge, and that "making similar arrangements to file an appeal in a hasty manner will greatly increase the risks to these girls of being found out." She concluded by stating that "[r]equiring minors who lack parental consent to appeal within twenty-four hours will jeopardize confidentiality by forcing minors to make phone calls and get to court at unsafe times. This restriction will significantly reduce a minor's ability to pursue an abortion without her parents' knowledge, and in many cases may prevent her from obtaining an abortion at all." (J.A. at 159, Butler Decl. at ¶ 12.)

Declarations from Terri Wright Lloyd, Lisa Thomas, and Connie Simpson, directors at clinics in Memphis and Knoxville, further reinforced the logistical impracticalities imposed by the twenty-four hour appeal process and the bypass process in general. Lloyd opined that the first difficulty faced by the minor regarding the appeal will be learning about the court's decision within the twenty-four hour time frame in the face of her inability to make or receive telephone calls:

> Often our minor patients cannot receive calls at home. They fear that the caller can be identified with "caller I.D." services or "star 69" call back features. If we need to contact them about a medical matter we must contact a friend or relative and leave a message for the minor to call back. Often it can take days or even a week for the minor to return the call because she cannot find a time to do so without being observed or overheard by her parents or family members. Also, if the minor lives in an area that requires a toll call to the clinic, which would show up on her parents' phone bill, she must find a time to get to a phone outside her home. Some minors also are so poor that they do not even have telephones in their homes. Minors are further delayed because the times they can return a call are limited, as they are in school, without access to a phone, for most of the business hours of any week day and there are few hours when they are home and their parents are not. Based on these experiences, I believe that many minors will find that the 24 hour appeal deadline has expired before they can even safely call the juvenile court to find out if the court has issued a decision.

(J.A. at 148–49, Lloyd Decl. at ¶¶ 4–5.) Lloyd added that even if the minor finds out about the adverse decision in a timely fashion, the prospect of her being able to file a notice of appeal with in the twenty-

four hour limit "seems all but impossible." (J.A. at 149, Lloyd Decl. at ¶ 6.) Lloyd noted that immediately upon learning of the court's decision, the minor must somehow get away from home or school and make yet another trip to the courthouse during business hours to file the notice of appeal before the deadline runs out, which is extremely difficult or impossible for the minor in light of her lack of transportation and accountability for her absence from home or school. Lloyd concluded by noting that "the 24 hour appeal deadline will lead to many minors forfeiting their right to abortion. Alternatively, in their attempt to meet the statutory deadlines, the minors will place themselves at risk for parental abuse or retaliation by placing calls or leaving home at inappropriate times. Either way, the 24 hour appeal deadline will cause minors irreparable harm." (J.A. at 150, Lloyd Decl. at ¶ 7.)

Thomas characterized the bypass procedure, including the twenty-four hour appeal requirement, as a "bureaucratic, telephonic maze," (J.A. at 168, Thomas Decl. at ¶ 7), while Simpson opined that because it is so difficult for minors to make and receive calls, to travel to and from the courthouse, as well as to overcome their fear of coming to court, minors who are faced with pursuing the appeal confront "a Hobson's choice: she can attempt to file the notice of appeal in time and risk the very confidentiality she was struggling to maintain; or she can forgo an appeal and with it her ability to obtain an abortion, or to do so without suffering severe repercussions." (J.A. at 174–75, Simpson Decl. at ¶ 11.) Simpson based her opinion on her experience with minors who must make arrangements to have the abortion often weeks in advance due to logistical problems associated with remaining anonymous, all while the legal clock is ticking for the minor to exercise her right to choose in Tennessee:

> My experience has shown that minors face extreme difficulty getting away to have the abortion, and often take a week or more to make these arrangements. This is especially true for minors who must travel out-of-town to reach us. There are no trains that run into Knoxville and the buses do not reach the rural areas. Minors who do not have cars, which are most of our clients, must arrange for transportation with a friend or trusted relative. Often rides do not show up and they have to reschedule. And all of our minor patients who do not have parental consent must find excuses to mask their absence. Often times their plans unravel because, for example, a parent unexpectedly stays home from work. There is no reason to believe that a minor will have an easier time getting away to file a court document with the court.

(J.A. at 174, Simpson Decl. at ¶ 10.)

Here, in its desire to impose its outcome-driven holding, the majority abandons its legal obligation to apply the proper standard of review by blatantly dismissing the plethora of evidence in the record which supports the district court's findings of fact. Instead, the majority *goes outside the record* to find, based on an *assumption* that because Tennessee Rule of Appellate Procedure 4(d) allows civil litigants to file notices of appeal in advance, the minor may authorize an appeal at the time of her initial hearing, or authorize her attorney to do so if she is represented by counsel, thereby "greatly alleviat[ing] the need to remain in contact with and return to the court;" that because forty-eight hours is a narrow window of time within which the minor must remain in contact with the court even if she does not arrange for an appeal in advance, the burden of making calls is not substantial; that because the juvenile court is required to advise the minor that she has a right to counsel and an advocate who will assist her in navigating through the appeals process she will not be overly burdened; and because the appeal provision expedites the process and thereby serves the legitimate state interest of protecting the health of minors it

will likely be found constitutional. Such a holding, which is scant in its analysis and baseless in its conclusion, is an insult to the intelligence and sensibilities not only of the members of this court, but more importantly to the people whom this court serves, particularly when considering the wealth of evidence presented to the district court and the limited review under which the court is functioning with regard to a preliminary injunction. *See Mascio,* 160 F.3d at 312–13.

First, as noted at the outset of this dissent, a district court's decision to grant a preliminary injunction will be reversed only in the rarest of circumstances, where the district court abused its discretion in relying upon clearly erroneous findings of fact, in improperly applying the governing law, or in using an erroneous legal standard. *Mascio,* 160 F.3d at 312–13. This court cannot disturb a district court's findings as clearly erroneous as long as the court's account of the evidence is "plausible in light of the record viewed in its entirety" *See Anderson,* 470 U.S. at 573–74, 105 S.Ct. 1504. Indeed, in light of the overwhelming and unrebutted findings of fact regarding the logistical obstacles these girls must face in complying with the twenty-four hour appeal requirement and provisions of the judicial bypass in general, the district court's findings can hardly be considered clearly erroneous. *See Anderson,* 470 U.S. at 573–74, 105 S.Ct. 1504 (finding that the reviewing court "may not reverse [the district court's account of the evidence] even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence

differently ... [such that] a district court's choice between two permissible views of the evidence cannot, therefore, be clearly erroneous"). Furthermore, the district court properly applied the undue burden test of *Casey,* 505 U.S. at 877, 112 S.Ct. 2791 (defining an undue burden as that when "a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus"), and the holding of *Bellotti II,* 443 U.S. at 644, 99 S.Ct. 3035 (finding that a bypass procedure and the appeals that follow must "be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained"), when it concluded that the impracticalities associated with the appeals process—such as making and receiving telephone calls on a timely basis, arranging transportation to return to the courthouse for a second time, accounting for time away from home or school, and familiarizing herself with the court system—rose to the level of a substantial obstacle to obtaining an abortion where the impracticalities compromised the minor's anonymity and delayed the abortion.[3]

Second, the majority's reasons for concluding otherwise are based on nothing more than speculation and conjecture, and raise more questions than they answer. For example, there is nothing in the record to support the majority's assumption that the minor will be able to authorize an advanced appeal and, more importantly, nothing in the record to suggest that she will be informed of her right to do so assuming that she has such a right.

---

**3.** When considering the statute is unconstitutional on its face, we must analyze the factual record to determine whether the challenged regulation in a large fraction of the cases in which it is relevant, will operate as a substantial obstacle to a woman's choice to undergo an abortion. *Casey,* 505 U.S. at 895, 112 S.Ct. 2791. However, three justices continue to insist that facial challenges to abortion statutes must fail unless there exists no set of circumstances in which the statute can be constitutionally applied. *See Janklow*

*v. Planned Parenthood,* 517 U.S. 1174, 116 S.Ct. 1582, 1584–85, 134 L.Ed.2d 679 (1996) (Scalia, J., dissenting from the denial of certiorari); *Ada v. Guam Soc'y of Obstetricians and Gynecologists,* 506 U.S. 1011, 1011–12, 113 S.Ct. 633, 634, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting from the denial of certiorari). Here, it is clear that the challenged provisions impose substantial obstacles to all minors seeking to utilize the judicial bypass process, as the factual record so supports.

Therefore, the majority's opinion leaves one asking whether the advanced appeal will be possible and, if so, how the minor will be made aware of her opportunity to authorize such an appeal. The majority's *assumption* that a minor *may* be able to authorize an appeal in advance, and its *assumption* that the juvenile court informs her of her right to do so, as well as its *assumption* that the minor will be able to comprehend the advanced appeal process, hardly renders the district court's findings of fact clearly erroneous or its application of the law misplaced, and therefore cannot be considered a basis for believing with "a definite and firm conviction that a mistake has been committed" by the district court. *United States Gypsum Co.,* 333 U.S. at 395, 68 S.Ct. 525.

Furthermore, the majority's conclusion that because the window of time in which the minor must remain in contact with the court is only forty-eight hours cannot constitute a substantial burden, even if she does not authorize an appeal in advance, not only minimizes and ignores the abundant evidence regarding how inaccessible telephonic communication is for these girls, it misapplies the law as well. The majority states that "[i]f within forty-eight hours of filing her petition she has not heard otherwise, she knows her petition has been denied and may appeal at any time." However, in so stating the majority misinterprets the Act's twenty-four hour notice of appeal requirement, which states that the minor must file her notice of appeal within twenty-four hours *unless* the court does not rule within forty-eight hours, and it is incumbent upon the *minor* to contact the court to determine whether a decision has been rendered in her case. Therefore, it is inaccurate for the majority to state that if the minor "has not heard" within forty-eight hours of filing her petition she knows that she can file her appeal at anytime, thereby somehow rendering silence from the court some sort of notification to the minor that her petition was denied. The fact remains that the minor is *not going to hear from the court one*

*way or the other,* even if she was in the position to receive a call from the court; and if she cannot remain in close contact during the critical forty-eight hour period and file her appeal within twenty-four hours, she will lose her right to an abortion without parental notification. I am appalled at the majority's unsupported and conclusory holding in light of the abundant evidence as to how difficult it is for these minors to make and receive telephone calls. Sitting in its "ivory tower," the majority ignores the realities of the situation and claims that making phone calls over a forty-eight hour period cannot be characterized as a substantial burden, thereby mocking the plight of these young girls for whom making a single telephone call, particularly during the court's business hours, may mean walking a long distance in a rural area to make a toll call from a public telephone, all without arousing suspicion or having her conversation overheard and her confidentiality destroyed.

In addition, the majority's conclusion that the appeals process is not a substantial burden because the minors are advised that they have a right to a court appointed attorney and are provided a court appointed advocate to give information regarding the legal procedures, is likewise unsupported by the record and flies in the face of the abundant evidence indicating how difficult it is for these girls to remain in communication with the attorney. Regardless of how many advocates or attorneys may be available, the fact remains that these minors find it extremely difficult to communicate with the attorney and without the ability to communicate, the attorney is irrelevant. Furthermore, in the case of small rural towns where this type of bypass may most likely be sought, the minors may feel that their confidentiality and anonymity are also at stake if they have to contact a law office where a relative or acquaintance may be employed as support staff.

Moreover, as accurately found by the district court, there is nothing in the Act to guarantee that the minor's waiver of counsel is "knowingly and intelligently" made and, as a result, the court must assure that the bypass process is constitutionally sound for those minors who do not utilize state personnel. In *Casey*, 505 U.S. at 905–06, 112 S.Ct. 2791, the Supreme Court recognized the significance of adequately assuring that a minor be made aware of the implications of self-representation when it upheld the Pennsylvania statute, which provides as follows:

> The pregnant woman may participate in proceedings in the court on her own behalf and the court may appoint a guardian ad litem to assist her. The court shall, however, advise her that she has a right to court appointed counsel, and shall provide her with such counsel unless she wishes to appear with private counsel or has knowingly and intelligently waived representation by counsel.

18 Penn. Cons.Stat. Ann. § 3206(e) (West 1999). Unlike the Pennsylvania statute, the language of the Tennessee statute at hand does not require that the waiver be knowingly and intelligently waived. Rather, the statute merely states in relevant part as follows:

> The minor may participate in proceedings in the court on the minor's own behalf or through a next friend. The court shall advise the minor that the minor has a right to court-appointed counsel and shall provide the minor with such counsel upon the minor's request.

Tenn.Code Ann. § 37–10–304(c)(1) (Michie Supp.1998). True enough, a minor female does not have a constitutional right of representation at a judicial bypass; however, because the language used in the Pennsylvania statute is similar to the language used to avoid one's Sixth Amendment right to counsel, the Pennsylvania statute more

likely guarantees that the judicial bypass proceeding does not impose an undue burden and is constitutional—in that the minor's decision to proceed in the judicial arena without counsel is made knowingly and intelligently. As noted, no such provision is provided for in the instant case.

Finally, in what can only be interpreted as sarcasm in light of the abundant evidence to the contrary, the majority makes the single sentence conclusion that "the appeal provision expedites the judicial bypass process and thereby serves the significant state interest in protecting the health of the minor because, as MPP itself notes, the longer the minor must wait to have an abortion, the greater the health risks become." This conclusion does violence to the numerous declarations submitted by MPP which indicated that the appeal process—which could take up to three to four weeks to complete—*added to the delay* the minor already experiences in receiving the abortion. *See* J.A. at 18, Henshaw Decl. at ¶ 8a; J.A. at 35–36, Stogner Decl. at ¶¶ 8–9; J.A. at 148–50, Lloyd Decl. at ¶¶ 4–7; J.A. at 157, Butler Decl. at ¶¶ 7, 12.[4] The declarations indicated that the minors typically wait longer than adult women to seek an abortion because they are unable to recognize the fact that they are pregnant due to irregular menstrual periods; because they face problems in arranging to have the abortion at a time that does not arouse the suspicion of parents, friends, or others; and because they have difficulty in raising the funds for an abortion. *See, e.g.*, J.A. at 11, Henshaw Decl. at ¶ 11. Thus, time is of particular significance in the case of a minor female in that with the delay, the procedure becomes less safe, more expensive, and less available. *See id.* In addition, as noted by the district court, given that abortions are performed in just four counties around Tennessee, many mi-

---

4. Dr. Henshaw stated in his declaration that the "tendency of teenagers to obtain abortions later in pregnancy has the largest single effect on the morbidity and mortality rates for abortion in this population." J.A. at 19, Henshaw

Decl. at ¶ 10. He further opined that the delay caused by the appeals process "significantly increases the health risks associated with abortion for young women." J.A. at 18, Henshaw Decl. at ¶ 8.

nors who choose to file in the county in which the abortion is being performed, *see infra* Part II.A.3., will not only have to travel long distances to obtain abortions and to file their petitions, but to make the same long trip to file any resulting appeal as well. J.A. at 170–71. Making the necessary transportation arrangements for these long trips is very difficult and adds to the delay. For example, the district court noted, albeit with skepticism in light of the declarations claiming that the time was actually much longer, that the state estimated that a minor may have to travel two and one-half hours in any direction to obtain an abortion in Tennessee and to file court documents. J.A. at 413 n.5. For the minor to secure transportation for yet another five-hour round trip to a courthouse to file an appeal, adds to the delay in the abortion process, places the girl's health in jeopardy, and may be virtually impossible for the girl to arrange. J.A. at 413 n.5. Accordingly, against this backdrop of evidence to the contrary, I find the majority's conclusion that the twenty-four appeal requirement serves the state's interest in protecting the health of its youth to be a travesty.

Rather, I believe that the district court properly concluded that "the State has failed to articulate a substantial countervailing interest in imposing such a rigid timeline when the initial petition is denied, while elsewhere in the Act no such limits are imposed." (J.A. at 414.) The district court correctly noted by way of example that if the juvenile court fails to rule on the petition within forty-eight hours, a minor may appeal "immediately," but is not held to any time limit, Tenn. Sup.Ct. R. 24(11)(d), and that the same is true for her appeal Tennessee Supreme Court. Tenn. Supp. Ct. R. 24(12)(e).

I am not persuaded otherwise by the majority's reliance upon *Manning v. Hunt*, 119 F.3d 254 (4th Cir.1997), where the Court of Appeals for the Fourth Circuit found that a twenty-four hour appeal provision in a North Carolina bypass proce-

dure was not an undue burden. Contrary to the majority's view, *Manning* clearly is distinguishable from the instant case in that, unlike the Tennessee courts, the North Carolina courts must rule on the minor's petition at the conclusion of the initial hearing, thereby obviating any need for the minor to contact the court to ascertain the court's ruling, or to return to the courthouse to file an appeal. *Id.* at 274–75. Furthermore, in North Carolina, "to appeal the minor need only sign and date a preprinted notice of appeal on the back of the order she receives from the state district court judge at the conclusion of the hearing." *Id.* at 275. Once again, the majority trivializes what is a significant distinctive fact by claiming that "this difference does not tip the scales in favor of unconstitutionality in view of the safeguards provided by the Tennessee procedure." Such a conclusion is laughable where the difference between the statutes *makes all the difference* because it renders all of the logistical impracticalities associated with the twenty-four hour appeal requirement moot.

I am likewise not persuaded by the majority's reliance upon *Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 491–92 n. 16, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983), where in a footnote to a section of an opinion by Justice Powell and joined only by Chief Justice Rehnquist, Justice Powell opined—after quoting a Missouri statute which incorporated an analogous requirement to the twenty-four hour appeal requirement as that at issue here—that "[w]e believe this section provides the framework for a constitutionally sufficient means of expediting judicial proceedings." I do not find this statement to be controlling precedent on this court inasmuch as Justice Powell was not speaking for a majority or even a plurality of the Court, no challenge to the twenty-four hour requirement was before the Court, and Justice Powell's opinion did not specifically ana-

lyze the twenty-four hour requirement. *Id.*

Rather, I find the case of *Planned Parenthood of Southern Arizona v. Neely*, 804 F.Supp. 1210, 1216–17 (D.Ariz.1992), persuasive where the United States District Court in Arizona found that a statute which *is* analogous to that in the instant case placed an "undue burden" on the minor who attempting to proceed without parental consent. Notably, the court found that "the problem with the 24–hour requirement is compounded by the fact that it applies to minors who are seeking to obtain abortions without their parents' knowledge, making notice to the minor of the adverse decision problematic *regardless of whether or not she has an attorney.*" *Id.* at 1217 (emphasis added).

In summary, I believe that when applying the proper standard of review, and not merely patronizing it in words, the district court's findings of fact were not clearly erroneous and it reached the only conclusion that the law permits under these facts—that the Act's truncated time for appeal imposes substantial obstacles to the bypass procedure such that it will significantly delay the minor's ability to obtain an abortion without parental consent and compromise her anonymity, thereby rendering the twenty-four hour appeal requirement unconstitutional. *See Casey,* 505 U.S. at 877, 112 S.Ct. 2791; *Bellotti II,* 443 U.S. at 644, 99 S.Ct. 3035.

**2. Sound Mind and Sufficient Intellectual Capacity Pleading Requirement**

Once again, the majority conspicuously fails to note any of the district court's findings of fact on this issue, and abandons its judicial obligation to employ the proper standard of review. *See Mascio,* 160 F.3d at 312–13. Rather, in a one sentence recitation, the majority notes that "the district court held that this provision was likely unconstitutional because it deterred minors who were not of sound mind and sufficient intellectual capacity from pursu-

ing the judicial bypass procedure and therefore subverted the *Bellotti II* requirement that a judicial bypass be available for those minors in whose best interests it is to have an abortion." Then, in an unsupported and conclusory three sentence analysis, the majority states that the district court's holding is "unwarranted." To the contrary, the record not only supports the district court's findings of fact, it renders the district court's holding quite "warranted." As such, I will provide the district court's well-founded findings of fact and accurate conclusions of law below; however, beforehand I note the relevant portion of the statute at issue, and law under which it is to be analyzed.

Rule 24(5)(a) requires a petitioner to include certain information in her petition, including a "statement whether the applicant is of sound mind and has sufficient intellectual capacity to consent to the abortion." The Rule provides in full as follows:

(a) The petition *shall contain* the following:

(i) The initials of the applicant;

(ii) The age of the applicant;

(iii) A statement that the applicant has been fully informed of the risks and consequences of the abortion;

(iv) *A statement whether the applicant is of sound mind and has sufficient intellectual capacity to consent to the abortion;*

(v) A prayer for relief asking the court to enter an order authorizing a physician to perform an abortion upon the applicant without first obtaining parental consent;

(vi) An unsworn verification stating that the information therein is true and correct and that the applicant is aware that any false statements made in the application are a violation of Tenn.Code Ann. § 39–16–702; and

(vii) The signature of the applicant, which shall consist only of the applicant's initials.

Tenn. Sup.Ct. R. 24(5)(a) (emphasis added). The Tennessee Supreme Court attached a Model Petition in the Appendix to Rule 24, which provides in paragraph six that "Applicant is of sound mind and has sufficient intellectual capacity to consent to an abortion." Tenn. Sup.Ct. R. 24 app; *see also* Tenn. Sup.Ct. R. 24(6) (providing that a minor's petition "shall be filed . . . in substantial conformity" with the Model Petition in the appendix to Rule 24). The next paragraph of the Model Petition states that "Applicant is mature and capable of giving informed consent to the proposed abortion. AND/OR The performance of an abortion upon the applicant would be in the applicant's best interest." Tenn. Sup.Ct. R. 24(7).

*Bellotti II* requires that every minor should be able to go to court to obtain a judicial bypass, and the court must grant the waiver whenever a minor can show "*either:* (1) that she is mature enough and well enough informed to make her abortion decision . . . *or* (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests." 443 U.S. at 643–44, 99 S.Ct. 3035 (footnote omitted, emphasis added); *see also Casey,* 505 U.S. at 899, 112 S.Ct. 2791 (reaffirming *Bellotti II* ).

### District Court's Findings of Fact & Conclusions of Law

Although the court found the potential unconstitutionality of this portion of the Act to be the most speculative of all the challenged provisions, the court agreed with MPP that Paragraph (6) of the Model Petition appears to create a maturity prerequisite such that unless the minor can satisfy "sound mind" and "intellectual capacity" prerequisite of Paragraph (6), a determination about the minor's "best interests," as provided in Paragraph (7) will not even occur, in violation of *Bellotti II.* The district court also found that the language of Rule 24 itself—that a minor must state "whether" she is of sound mind and sufficiently mature—is also not without

significant ambiguity, in that while a minor could read such language, answer "no," and still submit the petition, it would be equally plausible for the minor to who is unable to attest to a "sound mind and sufficient intellectual capacity" to believe that they are not permitted to submit a petition at all. The district court therefore concluded that given the ambiguities inherent in the Model Petition and the Rule, MPP would likely succeed regarding the unconstitutionality of the "sound mind and sufficient intellectual capacity" inasmuch as the requirement posed an undue burden to immature minors, or minors who are incapacitated due to mental disability, mental illness, or other detriment who could easily misinterpret the requirements. The court noted that the Constitution demands easing the minor's petition-drafting burdens, rather than multiplying them, and although the court had confidence in the ability of state court judges to use constitutionally sound judgment in assessing petitions regardless of the ambiguities in the Act, the concern here is not with the ability of the state court judge to exercise its duty, but the ability of the minor to understand the requirement so as to have an "effective opportunity" to exercise her right to an abortion, as required by *Bellotti II.*

### Majority Opinion

The majority concludes without analysis or controlling legal support, that "Rule 24 requires only that the minor state 'whether [she] is of sound mind and has sufficient intellectual capacity' "; it does not foreclose her from seeking an abortion if she does not have the capacity. The Rule thus asks for one form of proof for determining whether the minor satisfies the maturity prong of *Bellotti II.* Although item six of the model application contained in the appendix to the Rule requires the minor to state affirmatively that she is of "sound mind and has sufficient intellectual capacity," according to Rule 24(6) a minor's application "need only be in substantial conformity with the model application." Once

again, the majority's holding ignores the copious evidence in the record to the contrary, and begs the question as to whether the district court's finding that the "sound mind" and "sufficient intellectual capacity" requirement were ambiguous such that a minor may misinterpret the provision and conclude that she was unable to seek an abortion without parental consent because she could not meet the requirement.[5]

A review of the record clearly supports the district court's findings of fact. For example, Terri Wright Lloyd, MPP's Director of Counseling and Clinic Services, opined in her declaration as follows:

[I]mmature minors will be harmed [by the requirement]. I recall one thirteen-year-old we saw when the consent law was previously in effect. She wasn't quite mature enough to give consent on her own. She didn't have and couldn't get parental consent. Her mother was in jail and her father was not in the picture. She came in with her grandmother, who took care of her and supported her in her abortion decision. Her grandmother didn't have legal guardianship, however. At the time, we could refer them to court, because there was no requirement that the minor be of "sound mind" and "sufficient intellectual capacity" to consent to an abortion. Now, because of the new Rule, this choice won't be available to other minors like her. They will have no real choice but to carry to term.

J.A. at 223, Lloyd at ¶ 7. In this example, not only was the *minor* led to believe that she was foreclosed from receiving the abortion without parental consent in light of her inability to meet this requirement, the *clinic director* was led to believe the same. Accordingly, the district court's finding that the ambiguous nature of the

requirement would be misinterpreted and would prevent a minor from proceeding with bypass procedure and exercising her right to an abortion, was not based on speculation; but, rather, it was well-reasoned and grounded in fact based upon the record and therefore plausible in light of the record viewed in its entirety. *Anderson*, 470 U.S. at 573–74, 105 S.Ct. 1504. The majority's conclusion that the requirement does not foreclose the minor from seeking an abortion if she does not have the capacity, is simply a rhetorical statement which fails to address the confusing language of the requirement. The fact that the *rule itself* does not foreclose the minor who lacks the requisite mental or intellectual capacity from seeking an abortion, is meaningless if that fact is not clearly understood by the minor and those from whom she seeks assistance. Moreover, Defendants have failed to show that this requirement advances any legitimate state interest. They do not claim that they are using this requirement to gather information for some legitimate purpose, or for any other reason.

Furthermore, although not addressed by the district court, the statement of mental capacity requirement at issue is so ambiguous that I believe that the provision could be found unconstitutionally void for vagueness. The standard for determining unconstitutional vagueness is whether persons of common intelligence must necessarily guess at what conduct is regulated by the statute. *Broadrick v. Oklahoma*, 413 U.S. 601, 607, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). In making such a determination, the statute must be examined as a whole. *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 514, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989). Here, as properly explained by the district

5. The sole authority upon which the majority predicates its conclusion is *Ashcroft*, 462 U.S. at 479 n. 4, 493, 103 S.Ct. 2517, where Justice Powell, joined by Chief Justice Rehnquist, opined that a similar Missouri statutory requirement as interpreted avoided any constitutional infirmities. However, as Defendants

in this case concede, the Supreme Court did not directly address the statutory provision or explicitly consider the effects of the language. Therefore, I do not believe that this authority is binding on this issue, or provides precedential support for the majority's opinion.

court, the "sound mind and sufficient intellectual capacity" requirement forces a minor, and the adults from whom they seek assistance, to guess at what conduct is regulated, in that the minor seeking a judicial bypass may not proceed further into the process if she believes that she cannot meet this standard. In other words, the district court concluded that the minor who believes that she cannot meet the maturity requirement of Paragraph (6), may forgo the opportunity for a determination about their "best interests" as provided in Paragraph (7)—and thus forego her right to an abortion—because of the requirement's ambiguous language. Although the Act provides that a judge is to determine whether the minor is "mature and well informed enough to make the abortion decision on her own or ... [whether] the abortion would be in the minor's best interests," *see* Tenn.Code Ann. § 37–10–304(e), I do not believe that this statutory requirement cures the problem caused by the ambiguous language of the rule and Model Petition because, as the district court astutely recognized—our concern does not lie with the *court's* ability to properly interpret the bypass requirements, but with the *minor female's* ability to do so inasmuch as she may never reach the judiciary if she is thwarted from filing her petition.

Accordingly, although I believe that the district court properly found that MPP had a substantial likelihood of succeeding in proving that this provision of the Act is unconstitutional in that it violates *Bellotti II,* I also believe that an alternative ground for MPP succeeding in this regard is that this provision is void for vagueness. *See Neely,* 804 F.Supp. at 1213–14 (finding that a statute that proscribes medical procedures on minors without parental or guardian consent unconstitutionally vague because the statute failed to make clear which procedures were proscribed, thereby forcing a physician to choose not to perform a medical procedure which he or she may deem in good faith clinical judgment necessary to avoid a threat to the life or health of a woman, in violation of the woman's fundamental right). As such, I find the district court's conclusion quite "warranted" under the facts and the law, and the majority's antithetical conclusion to be a fiction.

### 3. The Venue Restriction

In a holding based upon nothing more than speculation, conjecture, and apparent clairvoyance, the majority concludes that the district court incorrectly assumed that Rule 24(4), which requires the minor to file her bypass petition in the county in which she resides or in the county in which the abortion is sought, "trumps" the statutory provision which permits the minor seeking a bypass to file her petition in the juvenile court of any county in the state. *See* Tenn.Code Ann. § 37–10–303(b). In my opinion, the majority's "crystal ball" analysis does nothing for the minor as the law currently stands because, until the Tennessee courts say otherwise, the minor is bound to file her petition in the county where she resides or where she seeks to have the abortion performed. Based upon the very real and abundant evidence on the record supporting the district court's findings of fact, I believe that the district court reached the correct conclusion under the law as it stands—as opposed to some soothsayer version thereof.

### District Court's Findings of Fact & Conclusions of Law

The district court accurately recognized that Tenn.Code Ann. § 37–10–303 provides that a minor submitting a bypass petition may file it in "the juvenile court of any county of this state," and that Tenn. Sup. Ct. R. 24(4) amended this provision by limiting the minor to "filing a petition in the Juvenile Court of either the county in which [she] resides or the county in which the abortion is sought." The court then found the venue restriction problematical inasmuch as it compromised a minor's confidentiality or burdened her with the diffi-

cult task of traveling a long distance. The court based its findings upon the unrefuted evidence submitted by MPP, such as the declaration from Connie Simpson, Director of Counseling at the Knoxville Center for Reproductive Health, wherein she opined as follows regarding the venue restriction:

Many minors will be unable to go through a waiver proceeding in their home counties without risking their confidentiality. Many more will be too afraid to try. The areas surrounding Knoxville where many of our patients come from *are very rural. It is next to impossible to go to any public place completely undetected.* One minor patient told us she couldn't pursue a waiver from the local court because her aunt worked there. Another tried to pursue a waive in her home county, only to discover the judge assigned to her case was her former Sunday school teacher. She was so afraid of appearing in front of someone who knew her and her parents that she left and did not pursue the waiver. The fears of being discovered are real, and will prevent some minors from attempting a waiver proceeding in their home counties.

Traveling to Knox County for a waiver is also not a viable alternative for many minors. *We have patients who travel as many as six hours to reach us for an abortion.* For minors traveling these distances, it is all they can do to get away once for the abortion. If they had to make this trip twice, they would face extreme hardships finding transportation and slipping away undetected. *In addition, many times minors only have one chance to get away. Now they use it to have an abortion. Some skip school or leave home unannounced, have the abortion, then return to home with some story or another, only to face grounding or close supervision from then on. If these minors use their one chance to travel to file a petition, they will then be unable to get away for the abortion, foreclosing the very option the bypass is meant to provide.*

(J.A. at 177–78, Simpson Decl. ¶¶ 19–20 (emphasis added).) The district court rejected the state's reliance upon a decision from the United States District Court for the Eastern District of Louisiana where a similar venue restriction—one that limited the filing of petitions to the "parish" in which the girl lives or in which the abortion is to be performed—was upheld, as well as the state's contention that the venue restriction made it more convenient for witnesses to attend the hearing. Instead, the district court found that the venue restriction "affirmatively creates a substantial risk that a young woman's confidentiality will be compromised, either by direct discovery in her home county or because of her prolonged absence traveling to the county where the abortion will be performed. Such potential *is not hypothetical nor implausible,* but ... proven and likely for the small group of minors that it affects. Furthermore, this Court is concerned first and foremost with the ability of the minor to access the bypass procedure, and feels certain that the burden of rearranging schedules and traveling inconvenient distances is more appropriately placed upon adult witnesses." (J.A. at 418 (emphasis added).)

The district court also found that, before the statute was amended by the venue restriction rule, the minor had the freedom to file her petition in the county she desired and, while this may not have eliminated her need to travel altogether, her ability to choose any county was more conducive when balancing her needs for anonymity and relative convenience. The district court concluded that such freedom is required in order to satisfy the undue burden standard, and based it conclusion in part on this court's holding in *Akron Ctr. for Reproductive Health v. Slaby,* 854 F.2d 852, 866 (6th Cir.1988), *rev'd on other grounds, Ohio v. Akron Ctr. for Reproductive Health ("Akron II"),* 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990), where this court found an Ohio statute was constitutional because it allowed a minor to

file her petition for a bypass in her home county, any county bordering her home county, or in the county where the abortion would be performed.

## Majority Opinion

The majority found that the district court "incorrectly assumed that the Rule trumps the Act;" however, I believe that it is the majority who is making speculative assumptions here. The majority begins by noting that when a rule of court conflicts with a legislative act, the general rule is that the act controls. It then goes on to state that "Tennessee has a mechanism by which procedural rules promulgated by the Tennessee Supreme Court may be approved by resolution of both houses of the Tennessee General Assembly," and that after such approval, the rules control despite conflicting provisions of the Tennessee Code. The majority concluded that because no evidence had been presented to indicate that Rule 24 had been approved by such joint resolution, it was "confident" that the venue provision found in the statute prevails over that found in Rule 24, and therefore "no greater choice of venue could be provided."

I believe that in accordance with its usual result-driven thinking, the majority's conclusion misses the mark in that no matter how "confident" the majority may be that the venue provision found in Tenn. Code Ann. § 37–10–303(b) prevails over that found in Rule 24, the fact remains that the *minor* does not share in this confidence and, as such, will not avail herself of the broader venue provision as long as the law stays status quo. There is nothing in the record to suggest that the minor, or any counselor from whom she may seek advice, would believe that she is allowed to file her petition in the juvenile court of any county of the state. To the contrary, the record is replete with affirmations from counselors and directors who believe that the minor is required to file her petition in accordance with Rule 24, and that this requirement compromises the minor's confidentiality and imposes severe obstacles in terms of the minor's ability to travel to far distant counties. (J.A. at 152, Lloyd Decl. at ¶¶ 12–14; J.A. at 161, Butler Decl. at ¶¶ 18–21; J.A. at 177, Simpson Decl. at ¶¶ 17–21; J.A. at 221–22, Lloyd Supp. Decl. at ¶¶ 3–5.)

For example, Diane Butler, Director of the Memphis Center for Reproductive Health, opined as follows regarding the venue requirement:

> *I understand that the minor now may file her waiver petition only in the county where she lives or the county where the abortion will be performed.* This restriction will prevent many of our minors [sic] patients from obtaining an abortion confidentially, if they are to obtain one at all.
>
> In the rural areas from which many of our patients come, it is extremely difficult to maintain confidentiality. These communities are small, making it difficult to go unnoticed. *We had one adult patient who was afraid to obtain a money order made out to our clinic at her local bank. She feared that the teller, who knew her, would tell others about her activities.* Minors who live in these areas will not be safe pursuing a waiver in their communities.
>
> The other option under the new rule is for the minor to travel to Memphis for the waiver. For minors living outside the Memphis area, this option jeopardizes the minor's confidentiality and causes delay. Some of our patients travel as many as four hours each way to get to us to have an abortion. For minors, simply getting to Memphis is a problem. The minor has to find and pay for transportation. Public transportation is not readily available in rural areas in Tennessee, and many minors do not have their own cars. They must rely on friends or extended family to give them rides to Memphis. Making these travel arrangements takes time. Minors have to work around the schedules of the people on whom they rely on

[sic] to bring them to us, as well as the schedules of their patients. Minors must plan carefully to cover for the length of time it takes to travel back and forth to Memphis.

Timing is important for any abortion, but particularly for minors who tend to recognize their pregnancies later than older women. Teens often have erratic [menstrual] periods and they are more apt to deny what signs they see. *For some, little time will remain before her pregnancy advances to fifteen weeks, after which an abortion is unavailable in the state.* What is more, with delay comes increased health risks and increased cost. The clinic providing abortions through twenty weeks in Little Rock, [Arkansas,] for example, increases its fee from $500 for a fifteen week procedure to $700 for a twenty week procedure. The clinic in Granite City[, Illinois] performs abortions through twenty-four weeks, and charges fees that increase with each two week period of gestation up to $1,500. The increased cost itself can put the abortion beyond the minor's reach.

(J.A. at 161–62, Butler Decl. at ¶¶ 18–21 (emphasis added).) Terri Wright Lloyd, Director of Counseling and Clinic Services at MPP, also expressed her concern with the venue restriction, and by way of example, offered the following saga of a pregnant sixteen-year-old:

Last week, a sixteen-year-old came to the clinic, accompanied by her older sister. The minor was pregnant and came for an abortion. She had not known she needed parental consent. When we told her what she'd have to do to get the procedure, she was upset, for good reason. The minor said she can't tell her parents because her mother is terminally ill. She doesn't want to add to her parents' stress and troubles. She had managed to get away, undetected, planning to end the pregnancy without their knowledge.

She is troubled by the bypass option. She doesn't know what to do. For her, the bypass isn't a realistic choice. She is from a small town, more than a two-hour drive from Memphis. She said she can't possibly go to court in her home county. Too many people know her and would recognize her going to court. She fears that if she is seen, her parents will learn about her pregnancy and planned abortion. After all, she has no other purpose for being in court.

She doesn't know how she can pursue the bypass in Memphis—her only other option. She doesn't see how she can travel to Memphis again for the bypass and again for the abortion without risking detection by her parents. Since she was here, we've heard from a family friend of the minor, an older man who knows the family. He explained that the story the minor told was true, and asked what could be done to help her. We explained the judicial bypass option to him, as we had explained it to the minor and her sister. *He reiterated that she is rightfully fearful that if she pursues the bypass, given the limited venue choices, her confidentiality will be jeopardized.*

Right now, this minor doesn't know what to do. *No option seems viable to enable her to get the care she wants and to protect her family.*

(J.A. at 221–22, Lloyd Supp. Decl. at ¶¶ 3–6 (emphasis added).)

Accordingly, the majority's "confidence" that the broader statutory venue restriction would prevail is meaningless inasmuch as the reality of the situation is such that the narrow venue restriction of the rule is being applied. This is unlike the scenario in *Akron II,* where the Supreme Court found that this court erred in concluding that finding an Ohio parental notification of abortion statute unconstitutional on its face inasmuch as this court based its opinion a worst-case analysis that might never occur—that the bypass procedure may take up to twenty-two days in a rare case.

*See Akron II,* 497 U.S. at 514, 110 S.Ct. 2972. The Court reasoned that the mere possibility of a worst case scenario occurring was not sufficient to invalidate a statute on its face. *Id.* Here, the threat to the minor's confidentiality as well as her ability to effectively exercise her right to an abortion without parental consent in light of the venue restrictions that are in force are very real, as evidenced by the declarations cited above, and more than plausible based upon the record. *Compare id.; see Anderson,* 470 U.S. at 573–74, 105 S.Ct. 1504.

Accordingly, I disagree with the majority's holding that "the district court incorrectly assumed that the Rule trumps the Act," where there is nothing in the record to suggest that the broader statutory venue provision will be utilized by the minors as the law currently stands. As illustrated above, the record supports the contrary conclusion that, in reality, the narrow venue restriction is being enforced as the law of the land and, in the process, burdening minors to the point of denying them the opportunity to exercise their constitutional right to abortion. As such, I believe that the district court properly concluded that MPP showed a strong likelihood that this provision would be found unconstitutional, particularly where the state has failed to show any countervailing legitimate interest in imposing the narrow venue requirement. Furthermore, to the extent that the majority's opinion may be interpreted as holding that Tennessee Supreme Court Rule 24(4) should not be enforced, I would agree inasmuch as the rule's venue restrictions are unconstitutional. However, the majority opinion expressly holds to the contrary. The Tennessee General Assembly has yet to speak as to whether the statute will prevail, and until such time— or until the rule is found unconstitutionally burdensome—the rule is in effect. *See* Tenn.Code Ann. § 37–10–304(i) (expressly providing for modifications of the Consent Act by the Tennessee Supreme Court).

### 4. *De Novo* Hearing by Circuit Court

As accurately noted by the district court, if the minor's bypass petition is denied by the juvenile court, she may appeal to the circuit court for the county in which the juvenile court is located. Under Tenn. Code Ann. § 37–10–304, the appeal shall be *de novo* to the circuit court. In addition, as the district court accurately recognized, Tenn. Sup.Ct. R. 24(12)(d) supplements the statute by vesting the circuit court with discretion to "hear the case *de novo* on the record, or require the witnesses, or some of them, to testify in person, ... [or to] hear additional witnesses in its discretion." As a result, the circuit court may compel a minor to appear before it in the appeals proceeding.

In probably the most ridiculous and insulting analysis of this entire unsupportable opinion, the majority concludes that requiring the minor return to the courthouse for a second hearing was not unduly burdensome. Ironically, the majority based its conclusion on the advantages afforded to an appellant when the court employs a *de novo* standard of review, as opposed to the deferential standard employed when reviewing a trial court's findings of fact. The majority certainly knows from where it speaks on this topic, for it purposefully and erroneously afforded the state the benefit of a *de novo* review, while disavowing its judicial obligation to afford the district court's findings of fact "great deference"—or any deference at all for that matter. As set forth below, I disagree with the majority and its unfounded result.

### *District Court's Findings of Fact & Conclusions of Law*

The district court found that the *de novo* hearing provision is likely to be found unconstitutionally burdensome. The court reasoned that because of the threats to minor's confidentiality posed by trips to the courthouse, as it outlined in its previous discussion on the various bypass provisions, the court was "wary of requiring

pregnant minors to schedule and make yet another trip." (J.A. at 419.) Relying upon the evidence presented by MPP, the district court noted that minors typically experience fear and shame in appearing before the court, and specifically noted the declaration of Connie Simpson, which states the following:

> I understand that, under the new rule, on appeal the court can require the testimony of the minor. Such a requirement, when imposed, will create a substantial obstacle for some minors.
>
> As I have mentioned, minors who attempt a waiver in their local counties risk their confidentiality with every appearance in court. For these minors, an additional trip to court on appeal may be more of a risk then they are willing to take. For those who file in our county, making the travel arrangements and getting away undetected yet again will prove impossible, or too risky.
>
> But that is not all. *Based on the clinic's experience with minors who have attempted to obtain a waiver, some minors will not be able to tolerate going to court a second time—especially after being turned down a first time. It is very traumatic for these girls to go to court even once to tell their story to a stranger. Minors who are denied are devastated and report feelings of humiliation and belittlement at not having been believed. Some attempt to obtain an abortion out of state. Others have told us they plan to self-abort. Others become resigned to having a child and try to hide their pregnancies. These minors will not return to court a second time.*

(J.A. at 179, Simpson Decl. at ¶¶ 22–24 (emphasis added).) The court also relied upon *Hodgson v. Minnesota*, 497 U.S. 417, 441, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) which noted that minors experienced "fear, tension, anxiety, and shame" when appearing in court for the bypass procedure. The court therefore concluded that because of the threat to the minor's confiden-

tiality, the logistical problems faced in arranging transportation to the courthouse, as well as the feeling of humiliation and shame experienced by the minor when facing a judge in the courtroom, the *de novo* hearing imposed an undue burden upon the minor's right to an abortion.

In so concluding, the court noted that the state failed to present any countervailing interest by forcing young, pregnant girls to repeat the traumatic and shameful experience of appearing before a judge about her abortion decision and family situation for a second time. The court flatly rejected the Fourth Circuit's recent decision upholding an analogous provision in a North Carolina statute, where the court found that the second hearing constituted a "bonus" rather than a "burden." *See Manning*, 119 F.3d at 274. The district court found that "to argue that the second appearance is necessary to help a minor receive an adequate hearing implies that the circuit court is incapable of fairly assessing such petitions if only provided with the written record," and concluded that such an argument was improper under *Akron II*. The court further found that the record supported the conclusion that the second hearing was most assuredly a burden, and that the situation may be different if the minor were allowed the *option* of choosing a personal appearance before the circuit court, inasmuch as it would provide a more meaningful "second bite at the apple," *Manning* purports.

### Majority Opinion

In what is the most intellectually insulting portion of the majority opinion thus far, the majority belittles the abundant evidence on the record regarding the threat that a second hearing places on a minor's anonymity and confidentiality, the logistical hurdles she faces in arranging transportation to attend a second hearing, as well as the fear and humiliation she experiences when appearing before the court; and, instead unpersuasively concludes as follows:

We are at a loss to understand how it can be seriously contended that by affording a reviewing court additional tools to carry out its responsibility of protecting the interests of a petitioning minor, the Tennessee General Assembly has placed a substantial obstacle in her path that hinders her choice in any meaningful way. One could just as unconvincingly argue that the initial hearing in juvenile court is more burdensome than allowing the minor to make her case entirely in writing. Whatever burden is placed upon the minors by a hearing requirement at both the juvenile and circuit court levels best serves the purpose of assuring that those minors who qualify for judicial bypass receive it and that those who do not qualify must obtain parental consent.

For the majority to say that "it is at a loss to understand how it can seriously be contended" that a second hearing can burden the minor, in light of the abundant evidence on the record to the contrary, is a travesty and makes a mockery of the plight these young girls face in exercising their constitutional rights. A trip to the courthouse for a hearing amounts to nothing more than "a day at the office" for the majority. However, for the young girl who finds herself pregnant—perhaps by virtue of incest or rape; penniless; shame-filled with no parent to whom to turn, and living in fear that she will somehow be punished for being pregnant—a second trip to a courthouse, which could easily be located hundreds of miles away, is as likely as a trip to the moon. Clearly, there could be no greater burden imposed, because the practical result is that the girl has had her right to choose eliminated.

At this point, at the risk of sounding redundant, I must emphasize that the proper standard under which this court is obligated to review the district court's grant of a preliminary injunction is one of *"great deference,"* where the preliminary injunction must be upheld unless the district court relied upon clearly erroneous findings of fact, misapplied the law, or used an erroneous legal standard. *Mascio*, 160 F.3d at 312–13. Furthermore, if a district court's account of the evidence—findings of fact—is plausible in light of the record viewed in its entirety, the reviewing court *"may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."* *Anderson*, 470 U.S. at 573–74, 105 S.Ct. 1504 (emphasis added). Yet, the majority ignores this well-established precedent in an opinion that can only be characterized as an embarrassing misinterpretation of the law that does great injury to the people whom it affects. The logistical hurdles and risk to confidentiality imposed by the requirement that a minor may have to appear for a second time before the court, are more than "plausible" when viewing the record in its entirety, and the district court therefore properly concluded that they impose an undue burden.

However, the majority then goes on to add further insult to this injury, by making the argument that the minor would much rather have a *de novo* hearing because she has a better chance at winning her appeal, than if the circuit court reviewed her case on the record where the circuit court would be required to give "considerable deference" to the juvenile court's findings of fact, and her chances of reversing the juvenile court would be less! How astute of the majority to state the proper standard of review. It is shameful that the majority only chooses to apply that standard when it is convenient, and, instead, perverts the law in a convoluted fashion for the sole purpose of perpetuating its end-driven result. Indeed, had the majority "practiced what it preached" in reviewing the case at hand, it would have afforded the district court the deference it so deserved, and affirmed the court's decision which is grounded in fact and law.

Furthermore, I believe that, once again, the majority opinion misses the mark in that it is not the *type* of hearing that is at

issue; rather, it is the fact that the minor may be required to appear as a witness before the court during its *de novo* review. Perhaps a more palatable requirement would to allow the minor the *option* of appearing before the circuit court; however, as the statute currently stands, I am, in the words of the majority, "at a loss as to how it can seriously be contended" that the minor is not unduly burdened by a second trip to the courthouse in light of the record and the *Bellotti II* requirements to constitutionality of a bypass procedure. *See Bellotti II*, 443 U.S. at 644, 99 S.Ct. 3035 ("The proceeding in which this showing is made must assure that a resolution of the issue, and any appeals that follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained").

### 5. The Pre–Petition Physician Consultation Requirement

Rule 24(5)(a)(iii) requires the minor's petition to contain "[a] statement that the applicant has been fully informed of the risks and consequences of the abortion." Tenn. Sup.Ct. R. 24(5)(a)(iii). The Model Petition goes further; paragraph four reads as follows: "The applicant desires to terminate her pregnancy and has consulted with the physician who is to perform the abortion, or with a referring petition, for that purpose the ____ day of _____, 19__. The applicant has been fully informed of the risks and consequences of the abortion." Tenn. Sup.Ct. R. 24 app.

The majority's decision finding that this requirement was not unduly burdensome is, like the majority's conclusions on the previous requirements, unfounded in fact and baseless in the law. I specifically note that the Tennessee Court of Appeals has found "that the combined effect of the physician-only counseling requirement in Tenn.Code Ann. § 39–15–202(b) and the mandatory waiting period in Tenn.Code Ann. § 39–15–202(d) unconstitutionally burdens a woman's procreational autonomy by unduly delaying their ability to obtain an abortion," and "until the Tennessee General Assembly makes the decision as to which of the policies is most important, neither the waiting period nor the physicians-only counseling requirement may be enforced." *Planned Parenthood of Middle Tenn. v. Sundquist*, No. 01A01–9601–CV–00052, 1998 WL 467110, at *50 (Tenn.Ct.App. Aug. 12, 1998), *appeal docketed* (Tenn. Feb. 16, 1999). Therefore, the Tennessee Court of Appeals has spoken and found the analogous statutory provision to Rule 24(5)(a)(iii) to be unconstitutional. In the instant case, I believe that the district court properly concluded that MPP showed a substantial likelihood that the physician-counseling requirement of Rule 24 would be found unconstitutional as well.

### District Court's Findings of Fact & Conclusions of Law

The district court found that because of the shortage of abortion providers and the cost of physician salaries, clinics are not staffed by full-time physicians and, as a consequence, most abortion patients receive their pre-abortion counseling from a health professional other than the physician performing the procedure. As such, the pregnant minor would have to arrange a meeting with a second person—a physician—to obtain the same information. The district court found that in the course of obtaining the physician consultation, the minor had to overcome the same obstacles that she faced with the twenty-four hour appeal requirement, the venue requirement, and the *de novo* review requirement. For example, if she chose to obtain the consultation from the physician performing the abortion, she would have to be able to make and receive telephone calls given the fact that the abortion providers work very limited schedules and are difficult to "track down;" or, if she chose her local physician, she ran the risk of compromising her confidentiality and anonymity. The district court also noted that Defendants conceded at oral argument that the rule's require-

ment presents an issue of the *timing* of the physician's remarks, as opposed to the substance of the remarks, and that it is just such timing that is constitutionally problematic for the minor seeking to avoid parental notice of their abortion.

The district court also recognized the statutory provision requiring a woman to orally consult with her attending physician before the abortion was performed, *see* Tenn.Code Ann. § 39–15–202(b), if found constitutionally sound, would apply to minors as well as to adult women; however, the court also noted that the rule posed a second question not provided by the statute: "will it be possible for a minor to schedule a separate visit with an attending physician in order to receive the requisite medical information?" (J.A. at 422.) The district court concluded that, in light of the many logistical obstacles that these girls face with the bypass procedure in general, scheduling such a visit was an undue burden and that these minor girls—the population whom the rule effects—did not have the ability of adult woman to comply with such a requirement.

### Majority Opinion

Once again, the majority shows total disregard for the trauma that these minor girls face in having to make or receive a single telephone call, by concluding that the physician consultation requirement does not present an undue burden because the consultation can be conducted over the telephone. This unfounded conclusion further ignores the abundant evidence of how difficult it is for the abortion provider to counsel the girls over the telephone because the providers have erratic and limited schedules and cannot make or receive telephone calls easily for such consultations.

For example, clinic director Diane Butler opined that the physician consultation requirement will be "very difficult, if not impossible, for the minors to satisfy," and stated as follows:

Our clinic has three residents on staff who perform abortions. As residents of a local hospital, they have hectic schedules and frequently switch their shifts at our clinic. For a number of reasons, it will not be possible for a minor to know which physician will perform her abortion with any degree of certainty. As I have mentioned, minors frequently change their appointments because they cannot get away safely. As a result, minors cannot predict with certainty which day they will get to the clinic. From our end, we cannot guarantee that our doctors will not change their schedules, given their demands at the hospital.

Even if we could predict which doctor would perform a minor's abortion, it often will not be possible for the minor to get in touch with him or her in a timely manner. While here, our doctors are very busy performing surgery. A minor would have to catch them between patients—a substantial feat in and of itself. Most of the time, to speak with the physician, the minor would have to make arrangements to be called back. But as I have maintained, minors needing to protect their confidentiality can rarely be called at home. What is more, our doctors are at the clinic in the evenings and weekends, the very time when parents are most likely to be home. These same problems exist if the minors were to attempt to contact our doctors at the hospital.

Nor can the requirement typically be satisfied by the minor contacting a referring physician. Most minors do not have a doctor, separate from that of their family. Especially in rural areas, it is simply too risky for them to be seen in the waiting room by the office staff and other patients who might mention the minor's visit in passing to a parent. In addition, minors often can't afford office visit fees on top of the fees for the abortion.

Given our situation and that of our minor patients, the physician consultation requirement will prevent many of our minors [sic] patients from obtaining an abortion confidentially, if they are to obtain one at all.

(J.A. at 160–61, Butler Decl. at ¶¶ 13–18.) Similarly, another clinic director, Terri Wright Lloyd expressed her opinion that the physician consultation requirement imposes an extreme problem for minor girls to satisfy:

I understand that under the new court rules a minor must certify that she has consulted with the physician who will perform the abortion or a referring physician in order to obtain a judicial bypass of the consent requirement. This requirement too will be extremely difficult, if not impossible, for the minor clients to satisfy.

First, few if any of our minor patients have "referring" physicians. Because of their need to protect their confidentiality, they cannot consult with a family or local doctor to obtain information. Most learn about Memphis Planned Parenthood from the phone book or by word of mouth. Most minors therefore would have to satisfy this requirement by "consulting" with a physician at Memphis Planned Parenthood.

Physicians are available at our clinic during very limited hours, however. Our medical director is at our facility only 5 to 8 hours a week and is often out of town. Other physicians perform abortions at the clinic, but only two evenings a week and Saturday mornings. During the time physicians are here, they are providing abortions and are not generally available to meet with our patients. When they are not at Planned Parenthood they are working full-time as residents at a local hospital. For a minor to reach them at the hospital, the physician would have to be paged and return her call. For all the reasons detailed above, it is extremely difficult for minors to make calls during the lim-

ited hours the physicians work at the clinic or to place multiple calls in an attempt to reach residents while they are on duty, let alone to receive any answering phone call at home. *The very purpose of the bypass, to ensure the minor's confidentiality is protected, will be thwarted if minors have to meet this requirement.*

(J.A. at 150–51, Lloyd Decl. at ¶¶ 8–10 (emphasis added).)

Likewise, in concluding that the "combined effects of the physician-only counseling requirement in Tenn.Code Ann. § 39–15–202(b) and the waiting period in Tenn. Code Ann. § 39–15–202(d) will place substantial obstacles in the path of a large number of women seeking an abortion in Tennessee," the Tennessee Court of Appeals noted that obtaining a physician referral is particularly difficult for minor girls due to the several other obstacles they face in obtaining as abortion, such as the following:

Unemancipated women living at home face additional problems with regard to (a) obtaining the funds necessary to pay for the procedure, (b) discussing their pregnancy with their parents or seeking a judicial bypass of this requirement, (c) discussing their pregnancy with their sexual partner, and (d) finding the opportunity to be absent from school to obtain the counseling and the abortion.

*Planned Parenthood of Middle Tenn. v. Sundquist,* 1998 WL 467110, at *49 n. 93.

Accordingly, in light of the evidence presented on the record regarding the "impossibilities" these girls face in contacting a physician for the requisite consultation requirement such as making and receiving telephone calls particularly from an abortion provider physician; visiting a local physician without exposing the reason for the visit; finding the money to pay for the office visit; and finding the opportunity to be absent from school to attend the doctor's appointment or to make or receive the telephone call inasmuch as doing so may require the minor to make or receive the call at an anonymous location, I find it

incredible for the majority to conclude that this requirement does not impose an undue burden on the minor.

Furthermore, as found by the Tennessee Court of Appeals in relation to Tenn.Code Ann. §§ 39–15–202(b) and (d), when considering the physician consultation requirement in conjunction with the other requirements—such as the twenty-four hour appeal requirement, the venue restriction, and the *de novo* appeal by the circuit where the minor may be called as a witness—the burden clearly imposes substantial obstacles to a minor's right to have an abortion without parental consent. As such, I believe that the district court properly concluded that MPP showed a strong likelihood that the physician consultation requirement would be unconstitutional, and the majority's conclusion otherwise is no more than another blatant refusal to pay deference to the district court's findings of fact—which are more than "plausible" in light of the record—as well as another misapplication of the law.

Although the majority chose to end its "analysis" here, and declined to examine the other three factors that a district court considers in determining whether to issue a preliminary injunction—whether the movant would suffer irreparable injury without the injunction; whether the issuance of the injunction would cause substantial harm to others; whether the public interest would be served by issuance of the injunction—I will review them as follows inasmuch as the district court was "prompted by the fundamental nature of the rights at issue here to briefly state its position on the remaining elements of the preliminary injunction test." (J.A. at 422.) *See* Fed.R.Civ.P. 52(c); *In re DeLorean Co.*, 755 F.2d 1223, 1228 (6th Cir.1985) (finding that "Rule 52 requires a district court to make specific findings concerning each of these four factors, unless fewer are dispositive of the issue").

**B. Whether MPP Would Suffer Irreparable Injury Without the Injunction**

The district court found that because "the implementation of the Act's five challenged provisions would unduly burden minors' ability to obtain abortion care without parental consent[,] ... [s]uch a depravation, in itself, constitutes irreparable harm." (J.A. at 423.) The district court reasoned as follows:

> Under these provisions enjoined by the court today, minors may compromise their confidentiality or, fearing the same, forgo utilization of the bypass procedure. Either harm constitutes irreparable injury, whether abuse, forced pregnancy, or delayed abortion occur as a result. All of these harms are "irreversible and not compensable." *Pilgrim Med. Group [v. New Jersey State Bd. of Med. Examiners]*, [613 F.Supp. 837,] 848–49 [ (D.N.J.1985) ]; *see also Williams v. Zbaraz*, 442 U.S. 1309, 1314–15, 99 S.Ct. 2095, 60 L.Ed.2d 1033 (1979) (Stevens, J.) (denying stay) (ruling that increased risk of morbidity and mortality due to later-term abortion provided "support for plaintiff's claims of irreparable injury"). The Court is especially cognizant of the burdens placed upon immature or incapacitated minors when access to a bypass, and to abortion, is hindered.

(J.A. at 423–24.)

Based upon the plethora of evidence submitted by MPP regarding the substantial obstacles faced by minor girls in seeking a judicial bypass, I believe that the district court's findings of fact on the issue of irreparable harm if the injunction were not issued were more than "plausible" in light of the record in its entirety. *Anderson*, 470 U.S. at 573–74, 105 S.Ct. 1504. For example, the record indicates that if forced to comply with the impossible logistical hurdles imposed by the Act, a minor would face consequences such as forced pregnancy, abuse, or delayed abortion. *See, e.g.*, J.A. at 34–39, Henshaw Decl. at ¶¶ 4–15. In addition, the record also indicates that some minors would attempt to self-abort because they could not obtain parental consent and were unable to comply with requirements of the bypass procedure. *See, e.g.*, J.A. at 163–64, But-

ler Decl. at ¶ 26 (noting that she has seen minors who have attempted to self-abort by drinking quinine, binding their stomachs with ropes, or throwing themselves off of elevated decks).

I also believe that the district court properly concluded under the law that because the challenged provisions of the Act unduly burdened a minor's ability to obtain an abortion without parental consent, such a depravation constituted irreparable harm. *See Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (holding that if a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati,* 822 F.2d 1390, 1400 (6th Cir.1987) (noting that when reviewing a challenge to a preliminary injunction, a finding of substantial likelihood of unconstitutionality works in favor of finding that the other three factors support the issuance of an injunction); *see also, Connection Distributing Co. v. Reno,* 154 F.3d 281, 288 (6th Cir.1998) (finding that "[w]hen a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor"); *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir.1994) (finding that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights"); *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981) (holding that if the constitutional right of privacy is either threatened or in fact being impaired, this mandates a finding of irreparable injury).

**C. Whether Issuance of the Injunction Would Cause Substantial Harm to Others**

**And**

**D. Whether the Public Interest Would be Served by Issuance of the Injunction**

Like the district court, I consider these two factors in tandem and conclude that

they weigh in favor of granting the injunction. The district court noted that while it was cognizant of the significant constitutional interests at stake in protecting the relationship parents enjoy with their children, particularly in regard to abortion, the Supreme Court has stated that parental rights must give way to the constitutional rights of minors whose best interests are contrary to parental involvement. The court found that based upon the substantial evidence presented in this case as to how a minor's effort to obtain an abortion without parental consent will be thwarted, the minor's interest must prevail, particularly when the state was unable to prove that the harm suffered by the minor in the absence of an injunction is outweighed by any countervailing state interest, or that the harm suffered by the minor in the absence of an injunction is in any way consistent with the public interest.

Once again, the district court's findings are well-supported by the record and well-grounded in the law. As illustrated throughout this dissent, the record is replete with evidence in support of the substantial obstacles these minor girls must face in attempting to comply with the mandates of Tennessee's judicial bypass procedure, while the record is conspicuously void of any countervailing state interest to justify imposing such demands upon the minor so as to deny her her constitutional right. Furthermore, the public is certainly interested in preventing the enforcement of unconstitutional statutes and rules; therefore, no harm to the public will result from the issuance of the injunction here. *See Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati,* 822 F.2d at 1400.

***Summary***

In summary, because I believe that the district court's findings of fact were well-supported by the record, and that the

court correctly concluded that, in light of these facts, MPP showed a strong likelihood that the five provisions at issue would be found unconstitutional because they imposed an undue burden on the minor female attempting to exercise her right to an abortion without parental consent, I vehemently dissent from the majority's conclusion otherwise. When weighing and balancing the equities of the four considerations applicable to a preliminary injunction, I cannot convey strongly enough my firm belief that the district court did not abuse its discretion in granting MPP's motion for a preliminary injunction. United States District Court Judge John T. Nixon should be commended for his well-reasoned opinion which reached the only possible conclusion under the facts and the law.

## III.

### *Severability—Tennessee's Doctrine of Elision*

Because Tennessee's doctrine of elision applies, and because it is well-settled in Tennessee that elision is not favored, I believe that the district court properly concluded that the unconstitutional provisions at issue were not severable.

"The doctrine of elision allows a court, under appropriate circumstances when consistent with the expressed legislative intent, to elide an unconstitutional portion of a statute and find the remaining provisions to be constitutional and effective." *State ex rel. Barker v. Harmon,* 882 S.W.2d 352, 354 (Tenn.1994) (citing *Lowe's Cos., Inc. v. Cardwell,* 813 S.W.2d 428, 430 (Tenn.1991)). In *Harmon,* the Tennessee Supreme Court expounded on its view of the doctrine as follows:

> The doctrine of elision is not favored. The rule of elision applies if it is made to appear from the face of the statute that the legislature would have enacted it with the objectionable features omitted, and those portions of the statute which are not objectionable will be held valid

and enforceable ... provided, of course, there is left enough of the act for a complete law capable of enforcement and fairly answering the object of its passage. However a conclusion by the court that legislature would have enacted the act in question with the objectionable features omitted ought not to be reached unless such conclusion is made fairly clear of doubt from the face of the statute. Otherwise, its decree may be judicial legislation. The inclusion of a severability clause in the statute has been held by this Court to evidence an intent on the part of the legislature to have the valid parts of the statute enforced if some other portion of the statute has been declared unconstitutional.

882 S.W.2d at 355 (quoting *Gibson County Special Sch. Dist. v. Palmer,* 691 S.W.2d 544, 551 (Tenn.1985) (internal citations and quotations omitted)). Indeed, in the majority of cases where the Tennessee courts have elided an unconstitutional portion of a statute, the courts have relied on the severability clause within the act itself. *See, e.g., State v. Superior Oil,* 875 S.W.2d 658, 662 (Tenn.1994) (noting that the Tennessee General Assembly had specifically included a severability clause in the statute at issue); *Franks v. State,* 772 S.W.2d 428, 430 (Tenn.1989) (recognizing that severability clause in statute evidenced the General Assembly's intent to portion of act at issue elided); *Citicorp Fin. Servs. v. Adams,* 674 S.W.2d 705, 710 (Tenn.1984) (emphasizing statute at hand contained "very specific severability clause"). In *Harmon,* the Tennessee Supreme Court declined to apply to doctrine of elision, where the statute at issue did not contain a severability clause, and the court specifically noted that the lack of such a clause distinguished the statute from one where the court had applied the doctrine. 882 S.W.2d at 355–56.

Notably, there is no severability clause in the Parental Consent for Abortions by Minors Act, Tenn.Code Ann. §§ 37–10–301 to –307, nor in Tennessee Supreme Court Rule 24. Furthermore, there is nothing

on the face of the Act which evidences that the state legislature would have enacted the same without the offending portions. Accordingly, I believe that the district court in this case properly concluded that the five provisions at issue were not severable. The majority's conclusion to the contrary is not grounded in Tennessee law which, as stated, controls our determination of this issue. *See City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 772, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988).

## IV.

### *Conclusion*

The majority's decision to reverse United States District Court Judge Nixon's excellent opinion is an outrage and a travesty of justice. The majority makes a mockery of the very real and perilous position of these young girls who are now left without the ability to exercise their constitutional rights. Such an outcome is repugnant, particularly when one considers that the majority misinterprets the law to accomplish its goal. Therefore, I adamantly dissent from the majority opinion, and emphasize that "[i]t is inherent in the right to make the abortion decision that the right may be exercised without public scrutiny and in defiance of the contrary opinion of the sovereign or other third parties." *Bellotti II*, 443 U.S. at 655, 99 S.Ct. 3035 (opinion of Stevens, J.)

I strongly urge MPP and the young girls whom this decision affects not to become disheartened or to give up hope. Contrary to the message delivered to you by the majority today, your voices *are* being heard; the dilemma that you face *is* appreciated; and, hopefully, when your case is heard by jurists who choose to appropriately apply the law, today's outcome will be different.